OPINION OF THE COURT
Barbara Howe, J.
Plaintiffs have instituted this action to recover damages for injuries allegedly suffered by them as a result of various acts by defendants which plaintiffs characterize as negligent. Defendants have not yet answered in the action, but have instead moved pursuant to CPLR 3211 (a) (7) to dismiss the action on the grounds that "the complaint fails to state a cause of action for negligence” and that, as to what defendants view as the controlling acts alleged in the complaint, they are immune from liability.
I
Plaintiffs are the paternal grandparents of Amanda N., who *565 was born on September 18, 1985.[1] Amanda’s parents were divorced in 1987, and share joint custody of Amanda, with Cheryl B., Amanda’s mother, being the primary residential caregiver. On January 8, 1990, following a visit by her with plaintiffs, Amanda told her mother that Caryl S. had put a stick in her vagina or the vaginal area, causing it to bleed. Cheryl immediately took Amanda to Children’s Hospital for examination, but no physical evidence of sexual abuse was observed. On January 9, 1990, Cheryl apparently related the incident to the police and to Child Protection Services, and, on January 11, 1990, Cheryl called defendant Child & Adolescent Treatment Services, Inc. (hereafter CATS) regarding counsel-ling services for Amanda. On January 18, 1990, Cheryl filed a petition in Family Court seeking to preclude contact between Amanda and her paternal grandmother; and, on January 22, 1990, Amanda’s father, Michael N., filed a counterpetition seeking specific and defined visitation with Amanda.
The Family Court proceedings resulted in an April 3, 1990 temporary consent order which, inter alia> defined Michael N.’s visitation times with Amanda and prohibited contact between Amanda and Caryl S. Subsequent proceedings took place in Family Court concerning this matter, including one instituted by plaintiffs for visitation with Amanda. That proceeding, after a trial, resulted in a decision and order granted October 5, 1993 (Townsend, J.), whereby plaintiffs obtained, inter alla, the right to have "unrestricted daytime contact with [Amanda]”. Judge Townsend expressly declined to render an opinion "based upon the information presented in the lengthy hearing, whether, based upon a preponderance of evidence, Amanda suffered sexual abuse at the hands of any perpetrator, or specifically, her paternal grandmother”. Judge Townsend did observe, however, that "medical personnel at Children’s Hospital did not report the results of their examination to the Child Abuse and Maltreatment Hotline in Albany for further investigation, as they are mandated by law to do if they independently suspect sexual or physical abuse. The police brought no criminal charges against Caryl [S.], or anyone else, as a result of their investigation.”
*566 From February 20, 1990 until some time in 1992, Amanda was involved in counselling at CATS, being seen principally by defendant Jones. Jones gave information to various individuals, and testified in Family Court, about Amanda’s alleged sexual abuse by Caryl S. On March 29, 1990 for example, she wrote (with the apparent approval of defendant Henry) to Michael N.’s lawyer (in response to an inquiry by him) that Amanda had "disclosed to me being sexually abused by her paternal grandmother” and noting that, "[a]t this point, given the information that I have before me, I have no reason to doubt Amanda’s disclosure of sexual abuse.” On June 21, 1990, Jones (with Henry’s written concurrence) wrote to Cheryl B.’s attorney (in response to counsel’s inquiry) that "I have no reason to doubt Amanda’s statements [of sexual abuse by her paternal grandmother]”, also indicating that, having interviewed both of the present plaintiffs and based on her "work in this entire case, I have come to the opinion that Mrs. S.’s portrayal of events is not credible”. Jones then recommended that there be "no contact between Amanda and Mrs. S. until Mrs. S. can take responsibility for the injury Amanda experiences, and demonstrate restitutive behavior.” Jones told the Family Court Law Guardian, who had been appointed to represent Amanda, that she "[felt] that sexual abuse has occurred”; and Jones recommended that Mrs. S. "have only supervised visitation with amanda until such time as she has exhibited some responsibility for her actions and obtain[s] some counselling for whatever emotional problems she may have.” Jones was subsequently deposed in plaintiffs’ Family Court action to obtain visitation with Amanda, and she also testified at that trial.
Plaintiffs’ complaint sets forth three causes of action. The first cause of action alleges that defendants "negligently, carelessly and recklessly reached the false conclusion that the plaintiff, caryl [s.], had sexually abused amanda [n.],” and thereafter negligently, carelessly and recklessly informed others of that conclusion. The second cause of action alleges that CATS and defendant Henry negligently permitted defendant Jones, who it is alleged was not competent "to carry out such enormous responsibilities”, to investigate and reach an opinion that Caryl S. had sexually abused Amanda. The third cause of action is a derivative claim by Wallace S., Caryl S.’s husband, that defendants’ negligence resulted in a loss of consortium and obligated him "to expend large sums of money *567 for medical care and treatment” of Caryl S. as well as "for incidental costs and expenses”.
II
Although each cause of action proceeds on a different theory for recovery — the first, sounding in negligent misdiagnosis; the second, sounding essentially in negligent supervision (cf., Bleiler v Bodnar, 65 NY2d 65, 73); and the third, asserting a derivative claim on behalf of Caryl S.’s husband — all three are dependant upon the core issue of whether there was, in fact, a negligent misdiagnosis by defendants of sexual abuse. Defendants’ dismissal motion is divided into two main components: first, that there is no cause of action for negligence properly stated against them, and second, that the action is one, in reality, for defamation, as to which the statements and opinions of defendants are constitutionally protected and are otherwise shielded by immunity from suit. Plaintiffs contend that defendants misperceive the nature of this action, and argue that the complaint should not be dismissed.
"The standards in determining a CPLR 3211 (a) (7) motion for dismissal for failure to state a cause of action are well known. (See, e.g., 219 Broadway Corp. v Alexander’s, Inc., 46 NY2d 506, 509.) Such a motion assumes the truth of the complaint’s material allegations and whatever can be reasonably inferred therefrom. (See, Foley v D’Agostino, 21 AD2d 60, 65.) The motion should be denied if 'from [the pleading’s] four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law’. (Guggenheimer v Ginzburg, 43 NY2d 268, 275.)” (McGill v Parker, 179 AD2d 98, 105.) Applying these rules to the instant complaint, I find that there is no basis for dismissal.
Contrary to defendants’ claim that this is an action for defamation, it is clear that plaintiffs’ action is one for negligence. Plaintiffs allege that defendants "negligently, carelessly and recklessly” reached the conclusion that Caryl S. had sexually abused Amanda N., and that, thereafter, that conclusion was "negligently, carelessly and recklessly” communicated to others, which caused foreseeable serious injury and damage to plaintiffs. Thus, it is not the communication of the opinion in and of itself which is the gravamen of this action but rather the negligence in reaching that opinion.
Defendants argue that the "complainant fails to allege any relationship between plaintiffs and defendants nor any duty *568 owed by plaintiffs to defendants. * * * In the absence of a relationship between plaintiffs and defendants from which a duty could flow, there can be no claim for negligence.” Plaintiffs maintain that the duty to them resulted from the fact that it was reasonably foreseeable that when defendants negligently formed an opinion that Caryl S. had sexually abused her granddaughter Amanda, and when that negligently formed opinion was negligently communicated to others, the relationship between plaintiffs and Amanda would be "adversely affect[ed]” and plaintiffs would be harmed.
None of the parties has cited any New York authority which upholds (or rejects) the central theory of negligence that is alleged by plaintiffs (i.e., negligent misdiagnosis under the circumstances present here), and my research has disclosed none. Thus, this appears to be a case of first impression in this State, and familiar general principles of negligence must be examined to determine whether any such cause of action may be maintained.
"It is fundamental that to recover in a negligence action a plaintiff must establish that the defendant owed him [or her] a duty to use reasonable care, and that it breached that duty (Atkins v Glens Falls City School Dist., 53 NY2d 325, 333; Pulka v Edelman, 40 NY2d 781, 782; Kimbar v Estis, 1 NY2d 399, 405; Vogel v West Mountain Corp., 97 AD2d 46, 48).” (Turcotte v Fell, 68 NY2d 432, 437; cf. also, Strauss v Belle Realty Co., 65 NY2d 399, 402.) "In the absence of duty, there is no breach and without a breach there is no liability (Kim-bar v Estis, 1 NY2d 399, 405). This requirement is expressed in the often-quoted remark: 'Negligence in the air, so to speak, will not do’ (Pollock, Torts [13th ed], p 468)” (Pulka v Edelman, 40 NY2d 781, 782). "Duty is essentially a legal term by which we express our conclusion that there can be liability (see, generally, Green, The Duty Problem in Negligence Cases, 28 Col L Rev 1014)” (De Angelis v Lutheran Med. Ctr., 58 NY2d 1053, 1055).
The threshold question of the existence vel non of duty involves a determination "whether the plaintiff’s interests are entitled to legal protection against the defendant’s conduct” (Prosser and Keeton, Torts § 53, at 357 [5th ed]). "[T]he duty owed by one member of society to another is a legal issue for the courts (De Angelis v Lutheran Med. Center, 58 NY2d 1053, 1055). 'While moral and logical judgments are significant components of the analysis, we are also bound to consider the larger social consequences of our decisions and to tailor our *569 notion of duty so that "the legal consequences of wrongs [are limited] to a controllable degree” ’ (Waters v New York City Hous. Auth., 69 NY2d 225, 229, quoting Tobin v Grossman, 24 NY2d 609, 619; see also, Fazzolari v Portland School Dist. No. 1J, 303 Ore 1, 734 P2d 1326 [Linde, J.])” (Eiseman v State of New York, 70 NY2d 175, 187; cf. also, 79 NY Jur 2d, Negligence, § 15, at 328-330 [discussing factors to be considered]; Palka v Servicemaster Mgt. Servs. Corp., 83 NY2d 579).
Once a court has resolved whether any duty of care exists, the question of the scope of that duty arises. Here, the matter of the foreseeability of harm is significant (cf., Pulka v Edelman, supra, at 785; cf. also, 79 NY Jur 2d, Negligence, § 16, at 330-331), and the classic principle of Palsgraf v Long Is. R. R. Co. (248 NY 339, 344), delineating the "zone of risk”, is to be applied: "The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehensive.”
Courts have the responsibility, "in fixing the orbit of duty, 'to limit the legal consequences of wrongs to a controllable degree’ (Tobin v Grossman, 24 NY2d 609, 619; see also, Howard v Lecher, 42 NY2d 109), and to protect against crushing exposure to liability (see, Pulka v Edelman, 40 NY2d 781, supra; Ultramares Corp. v Touche, 255 NY 170). 'In fixing the bounds of that duty, not only logic and science, but policy play an important role’ (De Angelis v Lutheran Med. Center, 58 NY2d 1053, 1055; see also, Becker v Schwartz, 46 NY2d 401, 408).” (Strauss v Belle Realty Co., supra, at 402.)
It has been aptly observed that the sexual abuse of children, "[o]nce an undiscussed subject”, has — with justification — become "something of a national obsession” (Note, The Unreliability of Expert Testimony on the Typical Characteristics of Sexual Abuse Victims, 74 Geo LJ 429 [1985]). The concern is heightened when a family member is the suspected abuser: "In recent years preventing the sexual abuse of children in family settings has become a major social and judicial concern (see generally, Besharov, Introductory Practice Commentary, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act art 10, at 214-216). Such abuse is difficult to detect because the acts are predominately nonviolent and usually occur in secret rendering a child the only witness. Moreover, once abuse is uncovered it is difficult to fix blame, not only because of the lack of evidence but also because of the reluctance or inability of victims to testify.” (Matter of Nicole V., 71 NY2d 112, 117.)
*570 In dealing with the problems of child sexual abuse, the courts and nonlegal professionals have, over the last several years, given recognition to "syndrome” and "validation” evidence when considering whether or not sexual abuse in fact occurred. (Cf., e.g., People v Keindl, 68 NY2d 410, 422; Matter of Nicole V., supra; cf. also, Myers, Expert Testimony Regarding Child Sexual Abuse, 17 Child Abuse & Neglect [1993].) Such evidence, however, need not be accepted uncritically (cf., Matter of Swift v Swift, 162 AD2d 784, 785-786; Jane P. v John P., 135 Misc 2d 400 [rejecting expert validation testimony and noting the possibility of inadvertent "programming” of the child]; cf. also, Note Evaluating and Admitting Expert Opinion Testimony in Child Sexual Abuse Prosecutions, 41 Duke LJ 691 [1991]).
The best intentioned efforts towards determining whether sexual (or other types of) abuse has occurred and protecting children from it has not been without unfortunate downside effects. "In recent years, much progress has been made in exposing the plight of abused and neglected children and providing them with needed protection and treatment. However, during these good faith efforts to protect children, many innocent parents have suffered” (Besharov, 1987 Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 1011, 1994 Pocket Part, at 57 [emphasis added]; cf. also, Matter of T. C, 128 Misc 2d 156; Bell, When Salem Came to the Boro: True Story of the Cleveland Child Abuse Case [London, Pan Books Ltd. 1988]).
Particularly where the claim of abuse arises in connection with other, highly charged disputes (such as divorce or custody and visitation proceedings), the determination that sexual abuse occurred is fraught with added dangers: "More and more allegations of incest and [child] sexual abuse by husbands are being made by their wives during custody disputes. If the allegations are proven, the perpetrator, usually the husband/father, is excluded from contact with his children. * * * Child psychiatrists are frequently used by both sides to evaluate the child and make a determination about the authenticity of the charges. * * * A mistake might jeopardize a child’s future or destroy a man’s family life and career.” (Green, True and False Allegations of Sexual Abuse in Child Custody Disputes, 25 J of Am Academy of Child Psychiatry *571 449 [1986] [emphasis added].)[2] And, regardless of the setting where the claim arises, there is also the danger, where it is not the child himself or herself who specifically makes the abuse charge, that unfounded allegations of sexual abuse can have a permanent detrimental effect upon the child. (Cf., Matter of Jessica G., 151 Misc 2d 694, 696.)
Given the foregoing, it should be readily apparent that when a professional becomes involved in a case where child sexual abuse is suspected, care must be taken in investigating and evaluating such a claim and in reaching the conclusion that such abuse did take place. Where the professional is involved in a therapeutic relationship with the child, it requires little imagination to see the harm that might result from a negligently and erroneously formed conclusion that sexual abuse had occurred, with subsequent treatment based on that "misdiagnosis”. In such a situation there would be no dispute that a cause of action for malpractice (or ordinary negligence) would exist on the child’s behalf against the professional (cf., e.g., Lynch v Bay Ridge Obstetrical & Gynecological Assocs., 72 NY2d 632; Toth v Community Hosp., 22 NY2d 255, 262-263; LoDico v Caputi, 129 AD2d 361, 363; cf. also, Prosser and Keeton, Torts § 32, at 185 [5th ed]).
Where, however, the alleged abuser is not also involved in the therapeutic relationship with the child and his or her treating professional, the question arises, as here, whether that professional owes any duty of care to such an abuser. In that situation, a determination must initially be made by the professional that sexual abuse in fact occurred, and this determination is made not only about the child but also about the suspected abuser. When, based upon that determination, a course of action is thereafter embarked upon by the professional, it is intended to, and necessarily does, affect both the child and his or her abuser, especially where a family relationship is involved. A suspected abuser surely has the right to a reasonable expectation that such a determination, touching him or her as profoundly as it will, will be carefully made and will not be reached in a negligent manner.
The possible harm to a child from a professional misdiagnosis in such circumstances has already been noted. The potential harm to the alleged abuser is equally great. In Rossignol v Silvernail (185 AD2d 497, 499), the Appellate Division, Third *572 Department, referred to being labeled a child abuser as "one of the most loathsome labels in society”, and pointed out the "physical and psychological ramifications” that may be "attendant to * * * addressing, defending and dealing with” such accusations. Rossignol also noted that, once made, "such charges are difficult to escape” (supra, at 500). More recently, the Second Circuit Court of Appeals has stated that the inclusion of one’s name on the New York State Register of Child Abuse and Maltreatment, which identifies those reported to be suspected of child abuse or neglect, is potentially damaging to one’s reputation. By "branding [one] as a child abuser”, such listing "certainly calls into question [one’s] 'good name, reputation, honor, or integrity.’ [Board of Regents v] Roth, 408 U.S. [564], at 573 [1972].” (Valmonte v Bane, 18 F3d 992, 1000.)
Thus, I conclude that, where the determination of sexual abuse is made by a professional treating a child, with subsequent actions taken based upon that determination and aimed, whether in whole or in part, at shaping not only the conduct and well-being of the child but also the conduct of the suspected abuser, or the relationship between them, a duty of care is owed not only to the child but also to the alleged abuser. (Cf., e.g., Ossining Union Free School Dist. v Anderson, 73 NY2d 417; Glanzer v Shepard, 233 NY 236, 242 [finding a duty of care in analogous contexts]; cf. also, Montoya v Bebensee, 761 P2d 285 [Colo], and W.C.W. v Bird, 840 SW2d 50 [Tex], which expressly find such a duty of care owed to a suspected child sexual abuser.)
The "orbit of duty” in such situations is clearly limited to "specifically foreseeable parties [and] at the same time * * * contain[s] liability to manageable levels” (Strauss v Belle Realty Co., 65 NY2d 399, 404, supra; cf. also, White v Guarente, 43 NY2d 356; Glanzer v Shepard, supra). I find, therefore, that defendants did, in fact, owe a duty to plaintiffs under the circumstances alleged here, and that these causes of action sounding in negligence have been properly stated.
Ill
Defendants next claim that they have absolute immunity from any liability pursuant to section 419 of the Social Services Law. The statute provides that "[ajny person, official, or institution participating in good faith in the providing of a service pursuant to section four hundred twenty-four of this *573 title, the making of a report, the taking of photographs, or the removal or keeping of a child pursuant to this title shall have immunity from any liability, civil or criminal, that might otherwise result by reason of such actions. For the purpose of any proceeding, civil or criminal, the good faith of any such person, official or institution required to report cases of child abuse or maltreatment or providing a service pursuant to section four hundred twenty-four of this title shall be presumed, provided such person, official or institution was acting in the discharge of their duties and within the scope of their employment, and that such liability did not result from the willful misconduct or gross negligence of such person, official or institution. ” (Emphasis added.)
I find that the record presented to this court on defendants’ dismissal motion does not permit the conclusion to be drawn as a matter of law that such statutory immunity exists in this case. For one thing, to the extent that section 419 of the Social Services Law is tied to section 424 of that statute, which pertains to an investigation initiated by a child protective service, no such investigation was, apparently, ever commenced. For another, section 419 requires that the person or institution act in "good faith”, and it is at least arguable that a finding of gross negligence could result in this case which would undermine the requirement for immunity of defendants’ "participating in good faith”. (Cf., Rossignol v Silver-nail, supra.)
Finally, defendants have asserted other grounds for finding, as they phrase it, that they are "immune from liability for defamation”. Because I have concluded that this action, viewed broadly, is one for negligence and not for defamation, defendants’ remaining arguments are inapposite and are, therefore, without merit.
Accordingly, I find that all three of plaintiffs’ causes of action are facially valid, and for that reason defendants’ motion to dismiss the complaint pursuant to CPLR 3211 must be, and it hereby is, denied in all respects.

. This recitation of the facts underlying this case is based upon the voluminous materials submitted by the parties on defendants’ motion to dismiss. These facts are by no means deemed established, and are merely recounted here to set the backdrop to the allegations in the complaint and to furnish a framework for viewing the claims of the parties. (Cf., Rovello v Orofino Realty Co., 40 NY2d 633.)

. The same concerns would, of course, be true if a husband made such allegations about his wife.