Donald GARRISON, Individually and as Administrator of the Estate of Concordia Garrison; and Amber Garrison, by and through her Father and next Friend Donald Garrison, Appellants,

v.

Joanne M. LEAHY–AUER, M.D.; and University Hospital, Albert B. Chandler Medical Center, Appellees.

Joanne M. Leahy–Auer, M.D., Cross–Appellant,

v.

Donald Garrison, Individually and as Administrator of the Estate of Concordia Garrison; and Amber Garrison, by and through her Father and next Friend Donald Garrison, Cross–Appellees.

Nos. 2004–CA–002002–MR, 2004–CA–002089–MR.

Court of Appeals of Kentucky.

May 26, 2006.

Rehearing Denied Dec. 4, 2006.

Discretionary Review Denied by Supreme Court May 16, 2007.

Robert L. Elliott, Escum L. Moore, III, Lexington, KY, for appellants/cross-appellees.

William J. Gallion, T. Cornelius Sturgill, Jr., Elizabeth R. Seif, Lexington, KY, for appellees/cross-appellant.

Before HENRY, JOHNSON, and KNOPF, Judges.

*OPINION*

JOHNSON, Judge.

Donald Garrison, individually and as administrator of the estate of Concordia Garrison, and Amber Garrison, by and through her father and next friend, Donald Garrison (the Garrisons) have appealed from orders entered by the Fayette Circuit Court, dismissing their claims against the appellee, University Hospital, Albert B. Chandler Medical Center, also known as the University of Kentucky Medical Center (UKMC) and granting judgment in favor of the appellee/cross-appellant, Dr. Joanne M. Leahy–Auer, after a jury found that she was not negligent in her care of the infant/appellant Amber.[1] Having concluded that binding precedent provides immunity to the UKMC, we affirm as to the UKMC. Having further concluded under Dr. Leahy–Auer's protective cross-appeal that she is also entitled to immunity, we affirm as to Dr. Leahy–Auer.

Amber was born at the UKMC on May 13, 1994. Prior to being admitted to the UKMC, Concordia, Amber's mother, had 23 prenatal visits at the UKMC and was treated for gestational diabetes during her pregnancy. Concordia was admitted to the UKMC three days prior to Amber's birth and had a lengthy labor and ultimately delivered Amber by caesarean section. Concordia's membranes ruptured before the delivery and Amber had meconium[2] staining and some degree of meconium aspiration. Upon her arrival, Amber was depressed and had respiration difficulties and had to be resuscitated.[3] She required oxygen and was initially placed in the observational nursery and was then transferred to the newborn nursery on May 14, 1994, around noon. From Amber's medical records it appears that she did not pass a stool following her birth until noon on May 14, 1994, when she was moved into the newborn nursery. Concordia and Amber were discharged from the UKMC on May 17, 1994, at which time

---

1. Concordia died on January 12, 2002, and on October 28, 2002, Donald filed a motion to revive the action, which was granted.

2. Dr. Leahy–Auer testified that meconium is "a tarry substance. It is the first stool that the baby makes. Actually it starts around 18 to 20 weeks gestating in utero. And so, if the baby has been exposed to drugs, certain of them, they can get excreted into the baby's stool in utero."

3. Amber also had problems with hypoglycemia and chorioamnionitis during the first few hours after her birth.

Amber was healthy, showing no lingering health problems.

At the time of Amber's birth, Dr. Leahy–Auer was an assistant professor of pediatrics and Director of the Newborn Nursery at the UKMC. Dr. Leahy–Auer was listed on Amber's records as her admitting and attending physician because she was on service that month; however, because Amber was born on a Friday evening, she was delivered by Dr. John Walker, the attending physician on call for the weekend. Dr. Leahy–Auer did subsequently examine Amber on May 16, 1994, and determined that it was appropriate to discharge her the following morning.

At the center of this case is a meconium stool sample that was allegedly taken from Amber a few hours after her birth. There is no documentation in her medical records of such a sample being taken. However, there is sworn testimony in the record by Shannon Johnson, a patient-care assistant, that she was handed a sample by a nurse, Martha Hawkins, on the evening of Amber's birth and told to label the sample as Amber's and to send it to the in-house laboratory to be tested. She also testified that a resident physician verbally ordered the meconium drug screen on Amber.

The in-house laboratory processed this putative sample according to its routine protocol, including comparing the patient's name and hospital number on the requisition form to the ones on the sample. The in-house laboratory then sent the meconium sample to an outside laboratory, U.S. Drug Testing Laboratory, Inc. (USDTL) located in Chicago, which performed a screening test for drugs of abuse.[4] The test results were positive for cocaine and marijuana and the UKMC was timely notified by USDTL.

Upon receiving this information, Katie Boyd, a social worker employed by the UKMC, reported the results to the Cabinet for Families and Children (the Cabinet), as required by KRS[5] 620.030–050, which mandates the reporting of suspected child abuse. On June 2, 1994, Krista Grevious, a representative of the Cabinet, went to the Garrisons' home and informed them of the results of the test. The Garrisons adamantly denied any drug use and stated they were unaware that the test was performed on Amber. They then demanded a meeting with the physicians at the UKMC and the Cabinet.

On June 9, 1994, the Garrisons, Dr. Leahy–Auer, Boyd, and Grevious attended a meeting. Concordia again adamantly denied any use of drugs during her pregnancy. She offered to take a lie detector test and any necessary physical tests to prove she was drug free. The Garrisons claimed there must have been some mistake and asked the UKMC employees to review their records. There is no indication that the records were checked at that time.

On June 9, 1994, while Donald was at work, Grevious and two police officers went to the Garrison home and removed Amber and placed her in foster care. On June 14, 1994, a district court judge determined that based on the positive drug screen there was probable cause abuse had occurred which supported removing Amber from the home. Donald and Concordia were granted visitation with Amber for only one hour each week. Dr. Leahy–Auer also wrote a letter to the district court regarding the accuracy of the meco-

4. In order to substantiate a chain of custody and that the sample was taken from Amber, the lab in Chicago sent UKMC a requisition form. However, UKMC did not complete the form.

5. Kentucky Revised Statutes.

nium sample test.[6] On June 23, 1994, a second hearing was held before the district court and the trial judge returned Amber to Donald and Concordia, on the condition that they take regular drug tests[7] and that the results remain negative.

Approximately one month later, Boyd came to Dr. Leahy–Auer and informed her that Hawkins, the nurse who had taken care of Amber shortly after her birth, did not recall collecting a meconium sample on Amber. Dr. Leahy–Auer then reviewed the hospital chart and learned that there were discrepancies between the lab report's indication that the sample in question had been taken on May 13, 1994, at 9:36 p.m. and the nurse's notation that Amber's first stool was on May 14, 1994. Further, it was determined that another baby, born on the same day as Amber, had a positive drug screen on the same day with similar results. It was Dr. Leahy–Auer's opinion that such a discrepancy would make it difficult to prove that the sample in question belonged to Amber. Boyd then spoke with the Cabinet, advising that it was possible that the sample and drug screens were not Amber's. The Cabinet's investigation of the Garrisons ended on July 27, 1994. On that date, Boyd called the Garrisons and informed Donald that a mistake had occurred in the testing and the state was going to dismiss the abuse case. On August 4, 1994, the district court dismissed the case.

On June 12, 1995, the Garrisons filed a complaint in the Fayette Circuit Court against the UKMC, Dr. Leahy–Auer, and USDTL alleging they had been negligent in the handling of the meconium sample and by taking action against the Garrisons. The Garrisons asserted that as a direct and proximate result of this negligence they sustained serious, grievous, and permanent emotional injuries, resulting in past, present, and future damages.

On June 23, 1995, the UKMC filed a motion to dismiss the case against it based upon governmental immunity, which the trial court denied. However, the UKMC filed another motion to dismiss on June 13, 1997, after our Supreme Court's ruling in *Withers v. University of Kentucky*,[8] and the trial court subsequently dismissed the UKMC from the case on August 12, 1999. USDTL was dismissed from the case by agreed order on September 8, 2000. Dr. Leahy–Auer filed multiple motions for summary judgment in an effort to dismiss the case against her based upon immunity under KRS 620.030–050, which the trial court denied.[9] At a jury trial held from August 16, 2004, through August 19, 2004, a verdict of no liability was returned in favor of Dr. Leahy–Auer. The trial court subsequently entered a judgment on September 1, 2004, dismissing all claims against Dr. Leahy–Auer with prejudice. This appeal and cross-appeal followed.

### APPEAL NO.2004–CA–002002–MR
### UKMC'S IMMUNITY

■ The Garrisons argue that the trial court erred by dismissing their claims

---

6. Dr. Leahy–Auer stated that this letter was written for the social workers to present the facts regarding the meconium test. She claimed she had absolutely no responsibility in the investigation of the Garrisons as it was the statutory duty of the Cabinet to investigate, pursuant to KRS 620.030 *et seq.*

7. These drug tests were paid for by the Garrisons.

8. 939 S.W.2d 340 (Ky.1997).

9. While the Garrisons on August 30, 1999, were allowed to amend their complaint to add Boyd as a defendant, there is no indication in the record that judgment was rendered against her, or that she was dismissed as a party. Regardless, she is not a party to this appeal.

against the UKMC prior to trial because (1) *Withers* is contrary to the Kentucky Constitution [10] and the trial court's reliance on it was incorrect; and (2) even if *Withers* is constitutional, our Supreme Court's later ruling in *Yanero v. Davis*,[11] establishes classes of immunity and the UKMC at most would qualify for governmental immunity, and the UKMC would not be entitled to governmental immunity under the test in *Yanero* because at the time of the alleged injury it was serving a proprietary function, not a governmental function. Since this issue is purely legal in nature, we review the trial court's dismissal of the UKMC *de novo*.[12]

Our Supreme Court in *Withers* held that a negligence claim against the UKMC must be heard by the Board of Claims.[13] The Garrisons argue that this holding is contrary to the doctrine of jural rights as protected by Sections 14,[14] 54,[15] and 241 [16] of the Kentucky Constitution and that the General Assembly infringed upon these rights in establishing the Board of Claims Act under KRS 44.070 *et seq.*

Since this Court is required to follow the precedent of our Supreme Court [17] and since the Supreme Court in *Yanero* did not modify *Withers*, we are still bound by *Withers*. However, in the interest of fully addressing the Garrisons' arguments, we will discuss the merits of their arguments.

The doctrine of sovereign immunity is older than this Commonwealth's Constitution,[18] and, while not mentioned in the Constitution, it is an "inherent attribute of a sovereign state[.]" [19] Sections 14, 54, and 241 of the Kentucky Constitution " '[do] not trump the doctrine of sovereign immunity' " [citations omitted].[20]

Section 231 of the Kentucky Constitution states that "[t]he General Assembly may, by law, direct in what manner and in what courts suits may be brought against the Commonwealth." We do not view Section 231 as a source of sovereign immunity,

10. The Garrisons properly notified the Attorney General of their intent to challenge the constitutionality of KRS Chapter 44; and on October 26, 2004, the Attorney General filed with this Court a Notice of Intention Not to Intervene.

11. 65 S.W.3d 510 (Ky.2001).

12. *Carroll v. Meredith*, 59 S.W.3d 484, 489 (Ky.App.2001).

13. *Withers*, 939 S.W.2d at 346.

14. Section 14 of the Kentucky Constitution states as follows: "All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

15. Section 54 of the Kentucky Constitution states as follows: "The General Assembly shall have no power to limit the amount to be recovered for injures resulting in death, or for injuries to person or property."

16. Section 241 of the Kentucky Constitution states as follows: "Whenever the death of a person shall result from an injury inflicted by negligence or wrongful act, then, in every such case, damages may be recovered for such death, from the corporations and person so causing the same. Until otherwise provided by law, the action to recover such damages shall in all cases be prosecuted by the personal representative of the deceased person. The General Assembly may provide how the recovery shall go and to whom belong; and until such provision is made, the same shall form part of the personal estate of the deceased person."

17. Kentucky Rules of the Supreme Court 1.030(8)(a).

18. *Fields v. Lexington–Fayette Urban County Government*, 91 S.W.3d 110, 112 (Ky.App. 2001).

19. *Yanero*, 65 S.W.3d at 517.

20. *Fields*, 91 S.W.3d at 112.

but rather as a limited waiver of immunity, which granted the General Assembly the specific power to completely waive immunity or to partially waive immunity by creating a tribunal such as the Board of Claims.[21] The Garrisons further argue that because the Board of Claims is not a court,[22] their constitutional rights have been denied. However, prior to the creation of the Board of Claims statute, a claimant's rights against the Commonwealth or its immune entities did not exist. Thus, rather than violating the jural rights doctrine, the Board of Claims Act established a right to recover by providing a potential remedy where none existed prior to its adoption.

 As noted by the Garrisons, the Supreme Court in *Yanero* distinguished between sovereign immunity and governmental immunity. Sovereign immunity is that immunity afforded to the Commonwealth and certain government officials.[23] However, governmental immunity " 'is the public policy, derived from the traditional doctrine of sovereign immunity, that limits imposition of tort liability on a government agency.' " [24] Under the doctrine of governmental immunity, "a state agency is entitled to immunity from tort liability to the extent that it is performing a governmental, as opposed to a proprietary, function." [25]

KRS 44.073(1) [26] provides that the University of Kentucky, as a state university, is an agency of the Commonwealth,[27] and is supported by the state treasury.[28] *Withers* held that the UKMC was entitled to immunity from medical malpractice claims arising from its teaching hospital.[29] The Court specifically stated:

21. *Yanero*, 65 S.W.3d at 524.

22. *Id.* at 525.

23. *Id.* at 518. Those who are entitled to sovereign immunity include, but are not limited to, legislators in the performance of their legislative functions, judges for all their judicial acts, prosecutors with respect to initiation and pursuit of prosecutions, and a sitting President of the United States.

24. *Id.* at 519 (quoting 57 Am.Jur.2d, *Municipal, County, School & State Tort Liability*, § 10 (2001)).

25. *Yanero*, 65 S.W.3d at 519 (citing 72 Am. Jur.2d, *States, Territories, & Dependencies*, § 104 (1974)). The Court in *Yanero* acknowledged that the "application of the government/proprietary test does not guarantee consistent results.... However, that analysis has the attribute of relative simplicity in application and affords a reasonable compromise between allowing state agencies to perform their governmental functions without having to answer for their decisions in the context of tort litigation, and allowing private enterprises to pursue their legitimate business interests without unfair competition from government agencies performing purely proprietary func-

tions without the same costs and risks inherent in commercial enterprise." *Id.* at 521.

26. KRS 44.073(1) provides that state institutions of higher learning are state agencies within the meaning of the Board of Claims Act, which is found in KRS 44.070 through KRS 44.990.

27. The Supreme Court of Kentucky in *Kentucky Center for the Arts Corp. v. Berns*, 801 S.W.2d 327, 331–32 (Ky.1991) (quoting *Gnau v. Louisville & Jefferson Co. Metropolitan Sewer District*, 346 S.W.2d 754, 755 (Ky.1961)) stated that an entity is a state agency if it is " 'under the direction and control of the central state government[;]' " " 'supported by monies which are disbursed by authority of the Commissioner of Finance out of the State treasure[;]' " and thus, "when viewed as a whole, the entity is carrying out a function integral to state government." In *Berns*, it was found that the Kentucky Center for the Arts Corp. was a municipal corporation, and that while created by statute it did not perform services of central state government and was not entitled to governmental immunity.

28. *See* KRS 446.010(31).

29. *Withers*, 939 S.W.2d at 342–43.

The operation of a hospital is essential to the teaching and research function of the medical school. Medical school accreditation standards require comprehensive education and training and without a hospital, such would be impossible. Medical students and those in allied health sciences must have access to a sufficient number of patients in a variety of settings to insure proper training in all areas of medicine [footnote omitted].[30]

Subsequently, the Supreme Court in *Yanero*, concluded that the Jefferson County Board of Education was an agency of state government, and that it was entitled to governmental immunity against the claim that it had negligently failed to promulgate rules requiring students to wear batting helmets during batting practice.[31] The Supreme Court found that the Board of Education in authorizing and managing interscholastic athletics was "an integral part of secondary education and, thus, [serving] a governmental function" [citations omitted].[32]

The Garrisons argue that the treatment of patients and laboratory testing of samples are not teaching functions and should be considered proprietary, as the UKMC receives a fee for the services just as other hospitals in the community. In *Withers*, the appellants asserted that the university engaged in a propriety function because "the [UKMC] is nothing more than a hospital which is in full competition with and performs the same function as private hospitals."[33] The Supreme Court stated that governmental immunity will not be denied to a state university merely because a private entity provides similar services.[34] The Supreme Court noted that only the Legislature can waive immunity,[35] and it had not done so under those circumstances.[36] In *Yanero*, the Supreme Court reiterated this view and quoted *Withers* with approval.[37] Our Supreme Court, in *Yanero*, disagreed with Yanero's argument that sponsoring a baseball team was not a function integral to state government. The Supreme Court concluded that because interscholastic athletics was specifically included by statute as a function of the Board of Education, supervising athletic teams fell within the agency's governmental function.[38]

While this Court may not agree with all of our Supreme Court's holdings in *Withers* and *Yanero*, we are required to follow its precedent. Accordingly, the UKMC is entitled to governmental immunity in this case based on our Supreme Court's holdings in *Yanero* and *Withers*, as the functions of the UKMC in question were governmental.

### CROSS–APPEAL NO.2004–CA–002089– MR DR. LEAHY–AUER'S IMMUNITY

 We will now address Dr. Leahy–Auer's argument that she is immune from liability under KRS 620.050(1). Under KRS 620.030(1) any person who knows or has reasonable cause to believe a child has been abused shall immediately report the matter to the proper authority. Additionally, KRS 620.030(2) requires any person

---

30. *Id.* at 343.

31. *Yanero*, 65 S.W.3d at 527.

32. *Id.*

33. *Withers*, 939 S.W.2d at 343.

34. *Id.*

35. *Withers*, 939 S.W.2d at 344.

36. *Id.* at 346.

37. *Yanero*, 65 S.W.3d at 521.

38. *Id.* at 527.

who has attended a child as part of his or her professional duties to file, if requested, a written report. If a person is "acting upon reasonable cause in the making of a report or acting under KRS 620.030 to 620.050 in good faith[,]" KRS 620.050(1) provides that person with "immunity from liability, civil or criminal, that might otherwise be incurred or imposed." In this case there is no allegation that Dr. Leahy–Auer acted in bad faith.

There are two exceptions to the granting of immunity, but neither is applicable to the case before us. Subsection (2) of KRS 620.050 provides an exception to the granting of immunity and allows a negligence claim to be pursued against Cabinet employees and designated agents of a children's advocacy center. Subsection (14) of KRS 620.050 specifically provides an exception to immunity if the person acted negligently in performing medical diagnostic procedures at the request of the Cabinet based upon a report of abuse. However, Dr. Leahy–Auer was not a Cabinet employee or a designated agent of a children's advocacy center, and the test that is the subject of this case was performed before the abuse report was filed, not as a result of it. Thus, Dr. Leahy–Auer's alleged negligence does not come within the exceptions to immunity set out in KRS 620.050(2) and (14).

As persuasive authority for their position that Dr. Leahy–Auer has no immunity under KRS 620.050, the Garrisons rely upon the New York case of *Caryl S. v. Child & Adolescent Treatment Services, Inc.*[39] We do not find *Caryl S.* to be persuasive since it is clearly distinguishable. The Garrisons argue under *Caryl S.* that an alleged abuser should be allowed to expect that such an accusation "will be carefully made and will not be reached in a negligent manner."[40] However, *Caryl S.* did not involve a negligence claim against a medical professional as result of a report of abuse, but rather concerned a counselor who was providing counseling to an allegedly abused child upon request of the child's mother. The counselor was subsequently sued because of her testimony in a post-divorce custody action. The New York immunity statute, which is similar to KRS 620.050, was not applied in *Caryl S.* because the alleged negligent misdiagnosis did not pertain to an investigation by child protective services.[41]

Thus, having concluded that Dr. Leahy–Auer has immunity from liability under KRS 620.030(1) and KRS 620.050(1), any error which may have occurred at the trial of this action is moot. Accordingly, the judgment of the Fayette Circuit Court is affirmed.

ALL CONCUR.

---

**39.** 161 Misc.2d 563, 614 N.Y.S.2d 661 (N.Y.Sup.Ct.1994).

**40.** *Id.* at 571, 614 N.Y.S.2d 661.

**41.** *Id.* at 573, 614 N.Y.S.2d 661.