A.A., M.W., and C.A., BY AND THROUGH Their Mother and Next Friend, Rhonda LEWIS, and the Estate of Watson Adkins, Deceased, By and Through Its Administrator, Rhonda Lewis, Appellants

v.

Kristy SHUTTS, M.D., Appellee

NO. 2016-CA-000365-MR

Court of Appeals of Kentucky.

FEBRUARY 17, 2017; 10:00 A.M.

BRIEF FOR APPELLANTS: Joe F. Childers, Stephen G. Amato, Lexington, Kentucky

BRIEF FOR APPELLEE: Christopher P. O'Bryan, Whitney R. Kramer, Louisville, Kentucky

BEFORE: ACREE, CLAYTON, AND J. LAMBERT, JUDGES.

## OPINION

CLAYTON, JUDGE:

Multiple minors were placed in the foster care of their aunt and uncle. One of the

minors, Watson Adkins, was abused and murdered by the same uncle. The Appellants herein are Watson's estate and the surviving minors, by and through their mother, their next friend and administrator, Rhonda Lewis. They will be referred to collectively as the Adkins Estate. The Appellee herein, Dr. Kristy Shutts, treated Watson prior to his death and was sued by the Adkins Estate for failing to report his abuse to the proper authorities pursuant to Kentucky Revised Statutes ("KRS") 620.030. Dr. Shutts moved for summary judgment raising multiple grounds. The trial court considered some of the grounds and granted Dr. Shutts's motion for immunity from suit pursuant to KRS 620.050(1), finding that she neither acted in bad faith nor intentionally failed to report the abuse. The trial court also found "there was no reasonable cause for the doctor to suspect abuse[,]" thus "the requirements of KRS 620 to report said abuse did not apply."

Though there were other issues put before the trial court in the motion, the trial court expressly reserved those issues in the event the order granting immunity was reversed and remanded on appeal. The Adkins Estate now appeals.

## FACTS

In February of 2011, Watson and his three siblings were placed in the foster care of their aunt and uncle because their mother was dealing with drug-related issues. The placement proved disastrous, as Watson died from blunt-force injuries inflicted by his uncle on September 29, 2011. He was nearly three-years old.

Dr. Shutts's involvement began in February of 2011, shortly after the children were first placed in their foster home, when Dr. Shutts conducted the children's physical examinations. Her next involvement with Watson was in May of 2011. There, the children's mother had filed a report with social services alleging that the children were being abused by the aunt and uncle. Social services investigated, and both the aunt and uncle denied any abuse. Social services directed that the aunt take Watson to Dr. Shutts.

At the May 12, 2011 visit, the aunt informed Dr. Shutts about the purpose of the visit and the abuse allegations made by the mother. The aunt stated that Watson had fallen on a vent in the living room and injured himself. Watson's condition at the appointment—faint bruising on his forehead and two small scabs—was consistent with the aunt's explanation. Other than a failed hearing test and some difficulties with expressive language, the medical records show that Watson's physical condition was unremarkable.

Social services workers contacted Dr. Shutts about the appointment and received a copy of the medical exam. They also investigated all injuries that the other children had incurred in the months leading up to the complaint. All injuries were alleged by the aunt and uncle to have accidentally occurred by playing with toys and falling down. A detailed, ten-page report was created by social services. It concluded, "No maltreatment was found and the finding is unsubstantiated on Gladys and Jason Dickerson [the aunt and uncle] based on interviews with the alleged victims, perpetrators and collaterals as well as hard copy documentation including medication records." Dr. Shutts stated that she was advised by social services that they had investigated and determined there was no evidence of child abuse.

Watson was next seen at Dr. Shutts's office on June 16, 2011. Dr. Shutts's physician's assistant performed the medical examination and write-up, which Dr. Shutts later reviewed. Watson was having episodes of diarrhea and occasional abdominal pain. The aunt was advised to limit Wat-

son's sugary drink intake and monitor his symptoms. She was to return to the clinic if the symptoms worsened or did not resolve or if new symptoms emerged.

Dr. Shutts's office would not see Watson again for more than two months. On September 23, 2011, the aunt took one of Watson's siblings in for a scheduled wellness visit. She also brought along Watson. At the visit, the aunt asked Dr. Shutts to examine a cut on Watson's head. The aunt informed Dr. Shutts that Watson's uncle told her that Watson had fallen in a bathtub. The uncle informed the aunt that he had taken Watson to an emergency room, which had applied New-Skin, a glue-like substance, to the cut. The aunt did not know what emergency room they had visited. Dr. Shutts checked with Highlands Regional Medical Center, which had no record of a visit. Dr. Shutts did not believe Highlands ER used New-Skin for such cuts. Moreover, the substance appeared to be more akin to super glue than New-Skin. There are other emergency rooms in Floyd County, though, and some physicians would use the glue-like substance to close a wound, so Dr. Shutts asked Watson's aunt to bring back Watson the next week along with the ER records. Dr. Shutts stated the wound was small, about an inch or less in size, and appeared to be healing. Dr. Shutts was not suspicious that abuse was occurring due to the small wound. Children routinely fall and injure themselves, and she believed the explanation the aunt gave was plausible.

Watson died approximately a week later, before he ever returned to Dr. Shutts for his follow-up visit. His uncle, who was later convicted of murder and first-degree criminal abuse of a child under the age of 12, would "punish" Watson by making him walk around the couch with his hands up while the uncle would punch Watson in the stomach. Though Watson had injuries to other parts of his body, Watson died of multiple blunt-force injuries to his abdomen. As the medical examiner explained at the uncle's trial:

> But basically, why he died was because of his injuries to his abdomen. He bled into his abdomen and also the injuries to the bowel can just cause a person just to go into shock and die over time.
>
> . . .
>
> Basically, the cause of death is a hemoperitoneum. That means a bleed into the abdomen due to, you know, due to—due to blunt force injuries to the head, trunk, and extremities with lacerations and contusions of the small bowel or the intestine.

## STANDARD OF REVIEW

The trial court granted Dr. Shutts's motion for summary judgment. Accordingly, we must view "[t]he record ... in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 480 (Ky. 1991) (citing *Dossett v. New York Mining and Mfg. Co.,* 451 S.W.2d 843 (Ky. 1970)). "Appellate review of a summary judgment involves only legal questions and a determination of whether a disputed material issue of fact exists." *Shelton v. Kentucky Easter Seals Soc'y, Inc.,* 413 S.W.3d 901, 905 (Ky. 2013) (footnote omitted).

Under that review, summary judgment should only be granted "when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant." *Steelvest,* 807 S.W.2d at 483 (quoting *Paintsville Hosp. Co. v. Rose,* 683 S.W.2d 255, 256 (Ky. 1985)). "The moving party bears the initial burden of showing that no genuine issue of material fact exists, and then the

burden shifts to the party opposing summary judgment to present 'at least some affirmative evidence showing that there is a genuine issue of material fact for trial.'" *Lewis v. B&R Corp.*, 56 S.W.3d 432, 436 (Ky. App. 2001) (quoting *Steelvest*, 807 S.W.2d at 482). " '[I]mpossible' is used in a practical sense, not in an absolute sense." *Perkins v. Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992).

## ANALYSIS

Two issues are principally before us on appeal. The first is whether Dr. Shutts is entitled to immunity from suit. The second issue is, alternatively, whether Dr. Shutts is entitled to summary judgment regarding whether she breached her duty to report suspected child abuse. The Adkins Estate also raises ancillary issues that the trial court specifically reserved in the event the case was reversed and remanded. We begin with the immunity issue.

### I. Immunity.

■ The immunity question involves the interplay between Kentucky's statute requiring all people to report child abuse and Kentucky's statute granting immunity to those who are "acting" under the reporting statute. The Adkins Estate maintains that KRS 620.050's immunity from suit only applies when a person "acts" by making a child abuse report. The Adkins Estate claims that a person who decides not to "act"—i.e., a person decides not to report—is never immune from suit under KRS 620.050.

Dr. Shutts argues, conversely, that the immunity statute applies both: (1) to people who report; and, (2) to those who choose not to report if there is an absence of bad faith in the person's decision not to report. The trial court found in favor of Dr. Shutts. A proper analysis of the trial court's order requires a careful review of the statutes and case law interpreting the same.

KRS 620.030(1) ("Reporting Statute") mandates that "[a]ny person who knows or has reasonable cause to believe that a child is dependent, neglected, or abused shall immediately cause an oral or written report to be made to" one of numerous state agents, including law enforcement officers, the Cabinet for Health and Family Services, the Commonwealth's attorney's office, and the County attorney's office. KRS 620.050(1) ("Immunity Statute") grants immunity "from any liability, civil or criminal," to "[a]nyone acting upon reasonable cause in the making of a report or acting under KRS 620.030 to KRS 620.050 in good faith[.]"

The statutes work hand-in-hand to protect children, as the Reporting Statute seeks to "discover instances of child abuse or neglect," while the Immunity Statute seeks to "encourage reporting by eliminating the fear of potential lawsuits[.]" *Norton Hosps., Inc. v. Peyton*, 381 S.W.3d 286, 290 (Ky. 2012) (citation omitted). Our state Supreme Court has found the Reporting and Immunity Statutes are clear and unambiguous. *Id.* at 292. The Court has held that the Reporting Statute prescribes *criminal* penalties to anyone who "intentional[ly] fail[s] to" report when the person "*knows* or has *reasonable cause to believe* that a child is dependent, neglected, or abused[.]" *Id.* at 291 (emphasis in original). On the other hand, the Immunity Statute grants both "civil and criminal immunity to reporters." *Id.*

■ This civil and criminal immunity is granted in two circumstances: (1) when the person "acts upon reasonable cause in making of a report"; and (2) when the person "act[s] under KRS 620.030 to KRS 620.050 in good faith." KRS 620.050(1). The "good faith" provision is separate and does not merely restate the first provision.

*Norton Hosps.*, 381 S.W.3d at 292. It permits an examination of the actor's "state of mind" to determine whether the person *"believed* [he or she was] discharging a duty the law imposed upon [him or her]." *Id.* "Therefore, a reporter's good faith belief that he or she is discharging the lawful duty to report under KRS 620.030, even if such a belief is ultimately determined to be erroneous, is all that is required under KRS 620.050(1)." *Id.* at 293. This interpretation of the Immunity Statute's provisions has consistently been applied to immunize from suit those who *act* by *reporting* suspected child abuse. *J.S. v. Berla*, 456 S.W.3d 19 (Ky. App. 2015); *Collins v. KCEOC Cmty. Action P'ship, Inc.*, 455 S.W.3d 421 (Ky. App. 2015); *White v. Norton Healthcare, Inc.*, 435 S.W.3d 68 (Ky. App. 2014); *Leamon v. Phillips*, 423 S.W.3d 759 (Ky. App. 2014); *Morgan v. Bird*, 289 S.W.3d 222 (Ky. App. 2009); *Garrison v. Leahy-Auer*, 220 S.W.3d 693 (Ky. App. 2006); *Hazlett v. Evans*, 943 F.Supp. 785, 787 (E.D.Ky.) ("Because doctors are required to report for fear of criminal charges in failing to do so …").

Therefore, what is apparent from these two statutes is that the Reporting Statute requires, under threat of criminal sanctions, people to act by reporting suspected child abuse, and the Immunity Statute permits those who act by reporting suspected child abuse to be immune from both the criminal sanctions imposed by the Reporting Statute and any civil liability that may result *from the reporting.*

Dr. Shutts asks us to read the Immunity Statute more broadly to include immunity from civil (and, presumably, criminal) liability when a person "acts" in good faith by not reporting. We simply cannot find any statutory or case law to support such an interpretation. And from the statute's plain language and purpose, such an interpretation is contrary to the need to encourage reporting of suspected child abuse. Moreover, if we were to interpret the Immunity Statute to apply to non-acts (*i.e.,* omissions), then immunity from civil liability and criminal action would become the baseline in all cases. In other words, everyone—even those who know or have reasonable cause to believe a child is abused, neglected, or dependent—would be at all times immune from civil and criminal liability provided they act or omit to act in good faith.

Such an interpretation is too broad and outside the clear and unambiguous statutory language that immunizes those who are "acting." KRS 620.050(1). *See Commonwealth v. Allen*, 980 S.W.2d 278, 281 (Ky. 1998) ("All individuals with firsthand knowledge or reasonable cause to believe that a child is abused have a *mandatory duty to report* the abuse.") (emphasis added). Baseline immunity for a mandatory duty—unless one proves an absence of good faith—simply does not coalesce with the statutory mandate.

Thus, we hold that the Immunity Statute only applies to those who act by making a report. As Dr. Shutts did not make a report, she is not entitled to immunity from civil suit. The trial court's order holding otherwise is reversed.

## II. Breach of duty.

Having found the Immunity Statute does not apply to Dr. Shutts, we turn to the next issue, which is whether Dr. Shutts had "reasonable cause to believe" abuse was occurring. KRS 620.030(1). Regarding this issue, the trial court found as a matter of law that there was no reasonable cause to suspect abuse, thus Dr. Shutts did not violate the Reporting Statute. The Adkins Estate disagrees. They first argue this "reasonable cause" determination is a fact question for a jury to decide, and they also argue that viewing the evidence in a light

most favorable to the non-moving party (Adkins Estate), summary judgment should not have been granted. We first address Adkins Estate's primary argument.

Adkins Estate claims that whether a person knows or has reasonable cause to believe that a child is abused is a question of fact for the jury to decide pursuant to *Commonwealth v. Allen*, and *Shelton v. Kentucky Easter Seals Soc'y, Inc.*, We reject that *Allen* has any applicability here, as it was a criminal case regarding a failure to report suspected child abuse wherein the indictment was erroneously dismissed at a preliminary stage. *Allen* was reversed and remanded for further proceedings, including a possible trial where the trial court could *then* consider the evidentiary sufficiency on a motion for directed verdict, which is the proper course for dismissing criminal indictments due to a lack of evidence. *Allen* does not hold, as the Adkins Estate suggests, that whether the Reporting Statute is breached is always a factual determination for a jury.

Instead of *Allen*, the trial court relied on *Hazlett v. Evans*, 943 F.Supp. 785 (E.D. Ky. 1996), which rejected in *obiter dicta* the idea that the "reasonable cause" question is a fact issue for a jury. "The term 'reasonable cause' is a standard of measurement. Just as probable cause is an evidentiary standard that the Court determines when a defendant raises Fourth Amendment search and seizure issues, so to is 'reasonable cause'; such terms are not for the jury to decide." *Id.* at 787 (citing *United States v. Goff*, 6 F.3d 363, 365-66 (6th Cir. 1993), *United States v. Buchanon*, 72 F.3d 1217, 1222 (6th Cir. 1995)). This holding did not control the issue before the *Hazlett* court, however, as there the doctor had reported suspected abuse, and the issue of whether the doctor was entitled to immunity from suit tuned on

the good-faith exception. Moreover, *Hazlett*, as a federal district court opinion, is not binding on us.

 Thus, we find its reliance misplaced and return to the Adkins Estate's principal argument and the potential applicability of *Shelton*. Analysis of that holding requires an examination of the elements in a negligence cause of action. In an actionable negligence case, the plaintiff must prove a duty, a breach of duty, and a consequent injury. *Sparks v. Re/Max Allstar Realty, Inc.*, 55 S.W.3d 343, 348 fn. 15 (Ky. App. 2000). A consequent injury consists of actual injury and legal causation between the breach and the injury. *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88-89 (Ky. 2003).

In the instant case, Dr. Shutts had a statutory duty to report suspected child abuse when she had "reasonable cause to believe" it was occurring. Whether she breached that duty, then, is the question the trial court resolved in its summary judgment order. To that end, the Adkins Estate is correct that the breach question is generally a fact issue for a jury. In *Shelton* the Court held that the breach-of-duty determination in an open-and-obvious hazard case is generally a fact question. 413 S.W.3d at 913-914. The Court held that "the foreseeability of harm becomes a factor for the jury to determine what was required by the defendant in fulfilling the applicable standard of care." *Id.* at 914. Thus, when foreseeability of the risk of harm is a component of the breach analysis, it is a question that normally should be left to the jury. *Id.* However, it is not, as the Adkins Estate argues, a question that must always be left to the jury.

Under *Shelton'*s fact-based approach to breach-of-duty issues, summary judgment remains viable if "reasonable minds cannot differ or it would be unreasonable for a jury to find breach or causation[.]" *Id.* at

916. Summary judgment is also available "when no questions of material fact exist or when only one reasonable conclusion can be reached[.]" *Id.*

The Court recently reiterated *Shelton'* s breach-of-duty analysis in a bathtub slip-and-fall case. In *Goodwin v. Al J. Schneider Co.*, 501 S.W.3d 894, (Ky. 2016), a hotel was being sued because one of its patrons slipped and fell in a bathtub. A panel of this Court had affirmed the trial court's order granting summary judgment to the hotel because it found the hotel did not have a duty to provide bathmats for all patrons. Furthermore, the slippery bathtub did not create an unreasonable risk as a matter of law.

The Kentucky Supreme Court reversed, holding first that the open- and-obvious doctrine did not bar the suit as the slippery bathtub did not necessarily create an unreasonable risk. It then noted that the hotel owed a general duty to take reasonable steps to eliminate unreasonably dangerous conditions. Finally, it reversed and remanded for the trial court to consider the breach-of-duty question—"whether the Galt House's failure to provide bathmats breached its duty"—with the reminder to the trial court that summary judgment was only warranted "when a situation cannot be corrected by any means or when it is beyond dispute that the landowner had done all that was reasonable." *Id.* (quoting *Carter v. Bullitt Host, LLC*, 471 S.W.3d 288, 297 (Ky. 2015)).

■ These holdings are illustrative of the instant issue. As with open-and-obvious negligence cases where a party owes a general duty to eliminate unreasonably dangerous conditions, the Reporting Statute requires a party to attempt to elimi-nate child abuse by mandating the person report when he or she "reasonably believes" a child is being abused. KRS 620.030(1). Thus, the Reporting Statute imposes a duty on all people, including Dr. Shutts, and the issue in the negligence action necessarily focuses on the breach-of-duty question.

Though the breach-of-duty question is a fact question, it may, in limited circumstances, be resolved by summary judgment. *Goodwin, supra*; *Shelton, supra.* Thus, to the extent the Adkins Estate argues the breach-of-duty issue is a fact issue that only a jury can determine, its argument fails. Accordingly, we must now address Adkins Estate's second argument—that summary judgment should not have been granted.

■ In order for summary judgment to be granted to Dr. Shutts on the breach-of-duty question, we must view all of the evidence in a light most favorable to Adkins Estate and determine whether reasonable minds cannot differ or whether it would be unreasonable for a jury to find a breach of duty. Given this high bar and the facts currently before us,[1] we must reverse and remand the trial court's order. Dr. Shutts viewed the cut on the victim's head, inquired about it, and found some discrepancies with the aunt's story. Dr. Shutts was aware that abuse allegations had been previously raised against the aunt and uncle, and even though those suspicions were determined to be unsubstantiated, a jury could reasonably conclude one of two outcomes: either the previous allegations should have put Dr. Shutts on heightened alert for future abuse, thus necessitating that she report to social services the latest injury, or the previous allegations should have permitted Dr. Shutts to believe the

---

1. We express no opinion regarding future summary judgment motions should additional evidence be presented that alters the analysis.

current injuries were likewise just accidental, thus negating her duty to report.[2]

Based on the facts in the record, we would neither be inclined to find Dr. Shutts breached her duty to report nor would we find it *likely* that a jury would find a breach of duty. That is not the standard, however. The standard is reasonableness. Our holding today answers a narrow question: at this juncture, with these facts, and viewing the evidence in a light most favorable to the non-moving party, would it be unreasonable for a jury to find in Adkins Estate's favor on the breach-of-duty issue?

This high bar is not met, as a jury could reasonably conclude that Dr. Shutts should have been on heightened awareness to suspected abuse, thus triggering a duty to report the head injury, especially when the physical evidence and medical records left unanswered questions about the aunt's story. Thus, we reverse and remand the trial court's grant of summary judgment on this issue.

### III. Reserved issues.

Regarding the remaining issues raised by the parties, we will not address them as they are not ripe for appellate review. The trial court's order granting summary judgment specifically reserved "any decision on [the remaining issues] for a later date if necessary." As an appellate court, we are "without authority to review issues not raised in or decided by the trial court." *Norton Healthcare, Inc. v. Deng*, 487 S.W.3d 846, 852 (Ky. 2016) (quoting *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d

705, 734 (Ky. 2009)). As the case is being reversed and remanded for further proceedings, the trial court may address these issues on remand.

### CONCLUSION

We hold that a person who does not report suspected child abuse pursuant to KRS 620.030(1) is not entitled to KRS 620.050(1)'s immunity from civil suit. We further hold that viewing the facts before us in a light most favorable to the Adkins Estate, it is not unreasonable for a jury to find that Dr. Shutts breached her duty to report suspected child abuse. Thus, we reverse and remand the case for additional proceedings.

LAMBERT, J., JUDGE, CONCURS.

ACREE, JUDGE, CONCURS AND FILES SEPARATE CONCURRING OPINION.

ACREE , JUDGE, CONCURRING:

Once again, and for reasons more fully articulated in my concurrence in *Carney v. Galt*,[3] I have no choice but to concur.

Appellate review of a summary judgment involves only legal questions. One legal question used to be: was a duty owed? *Shelton*[4] eliminates the need to ask that question. Since *Shelton*, it will always be answered in the affirmative because the Kentucky Supreme Court has—or at least most certainly appears to have—fully embraced the universal duty of care concept

---

**2.** Indeed, we do not even know at this juncture whether Watson's head injury was a result of abuse. Watson's injury may have been due to an accidental fall in a bathtub, and thus Dr. Shutts was correct in assuming that the injury should not have been reported as suspected abuse. We note that the medical examiner concluded that Watson's fatal injuries were to his gastro-intestinal tract, not to his head.

**3.** *Carney v. Galt*, No. 2014-CA-001124-MR, 2017 WL 383451 (January 27, 2017).

**4.** *Shelton v. Kentucky Easter Seals Soc'y, Inc.*, 413 S.W.3d 901 (Ky. 2013).

of the dissenting opinion in *Palsgraf*[5] that for nearly a century Kentucky rejected, following instead the relational concept of duty, informed by a foreseeability analysis, that Judge Cardoza articulated in that case's majority opinion.[6]

Removing foreseeability from the duty analysis effectively makes establishing the duty element of a tort claim a *fait accompli*. In fact, "the concept of duty itself is incoherent—even if not meaningless or a 'nullity'—if stripped of a foreseeability component."[7] The Supreme Court tells us this switch "should not be viewed as a major change in our law[,]" *Shelton*, 413 S.W.3d at 917, and that this "is not a radical departure." *Carter v. Bullitt Host, LLC*, 471 S.W.3d 288, 298 (Ky. 2015). With all due respect, I do not believe either statement will prove true. As noted above, I have fully expressed my concern in concurrence with the majority in *Carney v. Galt* and I will stand on that position.

---

5. *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). In *Palsgraf*, the *literal* concept "of a 'universal duty of care' was rejected ... and the 'relational negligence' theory was adopted instead." *Middleton v. Village of Nichols*, 114 Misc.2d 596, 599, 452 N.Y.S.2d 157, 160 (N.Y. Sup. 1982).

6. At the very least, the Supreme Court is poised to embrace the concepts of the *Restatement (Third) of Torts*. Regarding the duty element, the new approach would be this: "[I]n cases involving physical harm, courts ordinarily need not concern themselves with the existence or content of this ordinary duty. They may proceed directly to the elements of liability...." *Restatement (Third) of Torts: Phys. & Emot. Harm* § 6 cmt f (2010).

7. Alani Golanski, *A New Look at Duty in Tort Law: Rehabilitating Foreseeability and Related Themes*, 75 Alb. L. Rev. 227 (2012) (quoting W. Jonathan Cardi, *Purging Foreseeability: The New Vision of Duty and Judicial Power in the Proposed Restatement (Third) of Torts*, 58 Vand. L. Rev. 739, 771 (2005)).