OPINION OF THE COURT
John D. Capilli, J.
By order to show cause, plaintiff mother seeks to terminate the respondent father’s visitation, based upon his alleged sexual molestation of the children during visitation.
The court begins with a review of the trial testimony.
a. plaintiff’s case:
Plaintiff produced a medical doctor, an investigator from the Queens Society for the Prevention of Cruelty to Children, an investigator from the Hudson County Prosecutor’s office, a psychologist from an agency which provides counseling on child sex abuse and prevention to victims of sex abuse, and a psychiatric social worker. Only two of these witnesses were qualified as experts. Dr. Barbara Tenney, director of pediatrics, Booth Medical Center, and Eileen Treacy, a psychologist and executive director, Kingsbridge Heights Community Center, who were qualified as experts, both testified that it was their expert opinion that the twin sisters were sexually abused. On cross-examination, it was established that Dr. Tenney was personally acquainted with the plaintiff, was aware that she works with abused children at a child guidance center, and had seen the plaintiff at conferences on child sex abuse. It was also established that Ms. Treacy was personally acquainted with the plaintiff and had taken an active role in assisting plaintiff prosecute this action.
Plaintiff testified that the children told her that defendant had touched them on their "hinny, boobies and vagina”. She then testified as to the procedure she followed wherein she took the children to the medical doctor and other professionals in the field.
On cross-examination, plaintiff acknowledged that she is employed by an agency which offers counseling and prevention for victims of child abuse. She is familiar with the work of Dr. Sgroi regarding child sex abuse syndrome, which plaintiff described as the "bible” in the field. The plaintiff further acknowledged that the girls had played with anatomically correct dolls on two occasions prior to April 23, 1986, and that she had shown them a videotape, "Better Safe than Sorry”, which instructs children "If Daddy touches you, tell Mommy”.
*402 b. defendant’s case:
Dr. Alan Levy, chief of forensic child psychiatry at Columbia Presbyterian Hospital, who was appointed by the court, conducted a series of 12 interviews with the children, in an effort to evaluate appropriate visitation. One child told Dr. Levy that her mother told her to say her father touched her. The other daughter stated that someone had told her to say her father touched her, but would not identify the person. Dr. Levy also saw the children interact with their mother and father. Dr. Levy concluded that the allegations of sexual molestation appeared to have been orchestrated and that he had grave doubts that any acts of sexual abuse took place.
Defendant and his girlfriend both emphatically denied that they ever sexually molested the twin sisters or witnessed any abuse of either of them.
C. IN CAMERA INTERVIEW
During the in camera interview, only one daughter was responsive, but her statements were confused. Rachell told the court that "Daddy touched me one time” and "Connie touched my boobies when I was ready to go to bed”. Rachell made two separate statements to the court that "Mommy told me to say that Daddy touched my hinny, boobies and vagina”. She stated that she wanted to visit with her father.
D. CONCLUSIONS OF LAW
The court is cognizant of the difficulties that exist in establishing sexual abuse of an infant. Often, as in the instant proceeding, there is no adult eyewitness to the alleged acts and no physical or medical evidence to support the allegations of sexual abuse. Plaintiff herein has attempted to establish that the defendant sexually abused his daughters by means of the children’s unsworn statements; the children’s out-of-court statements made to one or more adults; and expert "validation” testimony. Proof that a noncustodial parent has sexually abused his or her child would, without question, constitute a basis for suspending or restricting visitation in the child’s best interests.
"Validation” has been defined as "opinion testimony by an expert witness confirming or failing to confirm in a child the existence of intrafamilial child sex abuse syndrome.” (Deutsch, Child Sex-Abuse Cases Revisited, NYLJ, Dec. 23, 1986, at 2, col 3.) The admissibility of "validation” testimony in the context of a visitation proceeding has not, to this court’s knowledge, been previously addressed in any published deci *403 sion. The Court of Appeals recently held, in People v Keindl (68 NY2d 410), that expert psychological testimony regarding the sexually abused child syndrome was admissible in evidence for the limited purpose of explaining the psychological consequences experienced by sexually abused children. Validation testimony has, however, been held admissible in the context of a Family Court Act article 10 child abuse proceeding for the broader purpose of "validating” or corroborating a child’s prior out-of-court statement. (See, Matter of Fawn S., 123 AD2d 871; Matter of Carew, 131 Misc 2d 835; Dutchess County Dept. of Social Servs. v Bertha C., 130 Misc 2d 1043; Matter of Michael G., 129 Misc 2d 186; Matter of Tara H., 129 Misc 2d 508.)
In the prosecution of a child protective proceeding, Family Court Act § 1046 (a) (vi) provides, in contravention of common-law rules of evidence, that: "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence, but if uncorroborated, such statements shall not be sufficient to make a fact-finding of abuse or neglect. Any other evidence tending to support the reliability of the previous statements, including, but not limited to the types of evidence defined in this subdivision shall be sufficient corroboration”. Validation testimony can, in an appropriate case, constitute sufficient corroboration to enable a court to find, as a matter of law, that a child has been sexually abused. (See, Matter of Fawn S., supra.)
The issue arises as to whether a child’s unsworn, out-of-court statement that he or she has been sexually abused is admissible in a visitation proceeding and whether "validation” testimony may be admitted into evidence.
The use of expert psychological testimony in the context of a custody or visitation proceeding is well established (Kesseler v Kesseler, 10 NY2d 445); and the failure of the court to order independent psychiatric evaluation, when evidently critical, has been held to be an abuse of discretion. (Giraldo v Giraldo, 85 AD2d 164.) The use by the court of unsworn, in camera statements of a child to aid it in rendering a custody or visitation determination is also a well-established deviation from the rules of evidence, which require that testimony be sworn and subject to cross-examination. (See, Matter of Lincoln v Lincoln, 24 NY2d 270.) "Custodial questions have sociological implications, and we are confronted here by a situation where common-law adversary proceedings and social jurisprudence are not entirely harmonious and where some *404 reconciliation between them is necessary.” (Kesseler v Kesseler, supra, at 452.) In a custody or visitation proceeding based upon allegations of sexual abuse of a child too young to give sworn testimony, the evidentiary exceptions available in a child protective proceeding must be applicable. The child’s out-of-court statements, as well as expert psychological testimony "validating” or corroborating the child’s prior out-of-court statement, are admissible in a custody or visitation proceeding.
Two of plaintiffs witnesses, Dr. Barbara Tenney and Ms. Eileen Treacy, offered expert "validation” testimony. Dr. Tenney concluded that the sisters had been sexually molested, based upon their accurate description of sexual acts. Ms. Treacy concluded that the girls had been sexually fondled by defendant, based upon her perception that they exhibited many of the symptoms indicative of intrafamilial child sex abuse syndrome. Dr. Levy, a child psychiatrist appointed by the court as an independent expert, did not offer "validation” testimony, but testified as to his diagnosis. Dr. Levy advised the court that he had grave doubts as to the veracity of the allegations of sexual molestation.
After a careful, detailed review of all the testimony, particularly the expert testimony, the court finds that the plaintiff has failed to establish the allegations in her order to show cause by a fair preponderance of the credible evidence. In making this determination, the court has relied heavily on the testimony of Dr. Levy and has accorded less weight to the expert opinions offered by Dr. Tenney and Ms. Treacy. The court finds the testimony of Dr. Levy more reliable and more persuasive than the expert testimony offered by plaintiff’s witnesses for a number of reasons. Dr. Levy conducted a series of 12 interviews, which included evaluations of the children, both parties, and extended family members. Dr. Tenney and Ms. Treacy conducted only brief interviews with the children and the mother and did not evaluate the defendant. Dr. Levy reviewed all relevant reports and records and assessed the allegations herein in the perspective of the parties’ marital history. Neither of plaintiff’s experts addressed the issue of the character of the relationship between the parties. Both of plaintiff’s experts arrived at their opinions in accordance with principles set forth in the written works of Dr. Sgroi, an authority in the field of intrafamilial child sex abuse syndrome. Dr. Levy advised the court, however, that Dr. Sgroi’s work deals with child sex abuse in an intact family. As the *405 parties herein separated when the twins were only eight months old, the relevance of Dr. Sgroi’s work in the instant proceeding is unclear. The court also notes that both Dr. Tenney and Ms. Treacy are personal acquaintances of the plaintiff.
Further, the validity of the conclusions drawn by Dr. Tenney and Ms. Treacy must be evaluated in light of the unique circumstances of this case. Both experts testified that they had no knowledge that the children had been exposed by their mother to anatomically correct dolls, as well as a book and a videotape movie on the subject of avoidance of sexual abuse. The plaintiff is an administrator in a facility which provides treatment for sexually abused children. She testified that she is familiar with the work of Dr. Sgroi and she is clearly well informed regarding issues relevant to the field of intrafamilial child sex abuse, but, to this court’s knowledge, she has had no formal professional training in the field. In Dr. Levy’s words, Ms. P. has "super educated” her children in the area of avoidance of sexual abuse. Dr. Tenney concluded that the children had been sexually abused, based upon their knowledge of acts of a sexual nature. However, Dr. Tenney was not aware that the children had received considerable information from their mother on avoidance of sexual abuse.
Ms. Treacy concluded that the children had been sexually fondled, based upon the fact that they exhibited classic symptoms of the intrafamilial child sex abuse syndrome, as described by the noted authority, Dr. Sgroi. As was previously discussed, the relevancy of said syndrome to a postdivorce family, rather than an intact family, is unclear. Of greater concern to the court is the fact that many of the symptoms upon which Ms. Treacy relied, such as bedwetting, masturbation, and undressing in a "sexually provocative manner”, were not witnessed by Ms. Treacy, but were reported to her by the plaintiff. The court must note plaintiff’s knowledge in the field of child sex abuse and must recognize that she knew appropriate symptoms to report. The court also questions the fact that the plaintiff testified that the bedwetting and other symptoms first appeared one week before the alleged disclosure by the children, on April 23, 1986, although the sexual abuse allegedly occurred as early as December of 1985.
Dr. Levy found that the girls’ statements were inconsistent with each other and were internally inconsistent as well. The court also found many inconsistencies in the statements of the twins and their behavior. Ms. Treacy testified that when she *406 asked the sisters if they wanted to see their father they responded negatively. However, during their spontaneous play in her interview room, both girls called their father on a toy telephone and Rachell stated: "I am glad to meet you, Dad” in her "conversation” with her father. When Dr. Tenney interviewed Rachell, Rachell denied touching her father’s penis. In fact, both girls said on several occasions that when the "touching” occurred their father had clothes on. However, when Ms. Treacy asked Rachell to demonstrate how she touched her father using anatomically correct dolls, Rachell had the female doll touch the penis of the male doll.
During one interview, the girls stated that the "touching” occurred "lots of times” in "all the rooms” in their father’s house. During the in camera interview, Rachell stated that the touching only happened once. Further, during the in camera interview Rachell told the court that her mother had told her to say that daddy touched her, and, three times during the final session with Dr. Levy, even in the presence of her mother, Rachell stated that her mother had told her to say that daddy had touched her. Finally, the court notes that during the initial conversation with her mother on April 23, 1986, and during the initial interview with Ms. Treacy, Cassandra stated that her father had touched not her, but her sister; and that during the final session with Dr. Levy, Rachell made reference to daddy having touched her sister. Not only are the children’s statements inconsistent regarding the frequency or type of touching, but the children seem confused as to who was actually "touched”.
Dr. Levy advised the court that it is "quite possible” that Rachell and Cassandra had been "almost programmed” by their mother in her efforts to "super educate” them about avoidance of sexual abuse. He cited the mechanical fashion in which the girls recited the allegations of "touching” and their lack of anxiety in discussing the allegations in support of his conclusion. He also related to the court how, upon seeing their father for the first time in months, Rachell spontaneously remarked to the father: "You touched my sister’s hinny, but that’s not true”. Dr. Levy advised the court that it would be highly uncharacteristic for sexually abused children to confront the perpetrator with the allegations. Dr. Levy also noted the children’s joy at seeing their father and their ease in kissing him and sitting on his lap. He also advised the court that, while abused children are characteristically fearful of the abuser, Rachell and Cassandra exhibited no fear of the *407 defendant and expressed a strong desire to visit with their father. (The court also observed the twins in the presence of their father and saw them run into his arms, laughing and kissing.)
In addition to its reliance on expert testimony, the court based its determination to a significant degree on the demeanor of the parties. The defendant’s denial of the allegations that he sexually abused his daughter was emphatic, sincere and completely credible. The plaintiff appeared extremely anxious. The court found many of her statements, in particular her statements that the children feared their father and wanted him dead or in jail, to be inconsistent with the other evidence adduced at trial and incredible.
Based upon all the foregoing, it is the finding of this court that the defendant did not sexually molest Rachell and Cassandra. The plaintiff, by her over emphasis in educating her three-year-old twins to avoid sexual abuse, perhaps unintentionally, orchestrated the course of events which terminated in a court trial. The court is extremely concerned that the litigation of this proceeding, the numerous evaluations to which the children have been subjected, and the pressures brought to bear on the children by their mother will have left the children truly confused about what may have actually been done to them by their father and/or what will happen during future visitation. Despite the fact that this court has determined that the defendant did not, on any occasion, sexually abuse the children, the court is compelled, in the children’s best interests, to temporarily prohibit overnight visitation, as a transitory measure to minimize, as far as possible, any further trauma to the girls, before restoring defendant’s full visitation rights, as set forth in the parties’ decree of divorce. The temporary prohibition as to overnight visitation will diminish the need for the father to undress or bathe the children and will, hopefully, deter any other allegations of inappropriate behavior.
The court, therefore, directs and orders that, commencing forthwith and continuing until May 31, 1987, the defendant shall have visitation with the children, Rachell and Cassandra, away from the custodial residence, on Sunday of each week, from 10:00 a.m. to 7:00 p.m. The defendant shall also have visitation on alternate legal holidays, from 10:00 a.m. to 7:00 p.m., commencing with Martin Luther King Day on January 19, 1987.
*408 The proceeding shall be calendared for review on June 1, 1987, to address the issue of the restoration of overnight visitation. Upon the inability of the parties to stipulate on the issue of overnight visitation, the court shall order Dr. Levy to conduct an updated evaluation.