MOORE, J.
11 This is an appeal of a Child in Need of Care (CINC) adjudication from the First Juvenile District Court, Caddo Parish, the Honorable Paul Young presiding. The court adjudicated the minor female child, C.H., as a child in need of care based on its finding that the father committed sexual abuse by touching the four-year-old child inappropriately. He appeals this finding and the judgment based upon it. The mother answers the appeal, demanding that the couple’s son, S.H., also be declared a child in need of care despite no allegations or findings of abuse. For the reasons that follow, we reverse the judgment adjudicating C.H. a “child in need of care” and vacate the judgment of disposition; the mother’s answer to the appeal is dismissed, and the case is remanded to the juvenile court with instructions.
Facts and Procedural History
This CINC proceeding was initiated by the child’s mother while in the middle of a custody dispute incidental to a divorce proceeding filed in the First Judicial District Court filed on November 28, 2007. The mother moved out of the matrimonial domicile in early November of 2007, and the father remained in the home.
There are two children born of the marriage, C.H. (the alleged victim), age four, and S.H., age three. Pursuant to an interim custody and support judgment in district court, the parents shared joint custody with the mother designated as the domiciliary parent. The father had physical custody of the children every other weekend from Thursday evening to Monday morning. Because the parties could not agree on custody and visitation, the district court ordered the parties to mediate the custody 12issues.
Mediation did not proceed smoothly and was apparently breaking down by early May of 2008. We are able to glean from the record that the mother and the father had disagreed over the extent to which the father could have physical custody of the children.[1] The mother did not want a 50- *603 50 physical custody agreement because she wanted to move back to Arkansas with the children, while the father wanted to share physical custody of the children on an equal basis. In a facsimile sent on May 2, 2008 to the father’s attorney, the mother’s attorney stated that “mediation is not working,” and he asked, “how about Shelly Booker to be appointed?”. The mother’s counsel was referring to a proposal to engage a local social worker for a child custody evaluation. Shortly after this faxed letter, the allegations of sexual abuse surfaced and proceedings in the juvenile court commenced.
The mother testified that on May 6, 2008, she observed C.H. “touching herself a lot” (in the genital area) and asked the child what she was doing. She said that the child told her she was “tickling it.” She questioned the child further, she said, and that C.H. told her that her father tickles her in the bedroom and other places. The mother said she called her mother and several counselors who advised her to contact the Office of Community Services.
The mother contacted the Caddo Parish Office of Community Services (“OCS”) on May 6 or May 7, 2008. David Ersoff, an employee of |3OCS at that time, was assigned to investigate the mother’s allegations. After interviewing the mother on May 7, Mr. Ersoff scheduled a Gingerbread House interview and CARA Center examination. He also reported the allegation to the Shreveport police sex crimes unit. Detective Anthony Rei was assigned to the case.
The Gingerbread House interview took place on May 18, 2007. Mr. Ersoff and Det. Rei observed the interview from an adjoining room, but were connected via an intercom device to the interviewer, Crystal Clark, enabling them to communicate with Ms. Clark during the interview. During the interview, which was videotaped and reviewed by this court, C.H. appeared to be relaxed and responsive to Ms. Clark’s questions. As will be discussed in more detail below, C.H. stated that her father “did not” and then later indicated that he “did” tickle her on her “booty” as well as her knees, belly, ribs, etc. She was equally equivocal as to whether the alleged tickling occurred outside or inside her clothing. C.H. said her father did not, as stated by the mother, kiss her “booty,” the term she used for her genital area, nor was she afraid when her father tickled her.
The mother testified that, after the interview, Mr. Ersoff and Det. Rei told her that they were going to continue with the investigation and felt like “there is enough,” saying that C.H. did say that the father touched her under her clothes.
Mr. Ersoff accompanied the mother and C.H. to the CARA Center to have a medical exam of C.H. performed by Dr. Jennifer Rodriguez. According to Mr. Ersoff, the medical report indicated that C.H. had a labial adhesion of unknown origin. Mr. Ersoff testified that he understood Dr. | .Rodriguez to conclude that the labial adhesion “may or may not have come from sexual abuse.” C.H.’s hymen was intact. C.H. was prescribed an ointment which subsequently cleared up the adhesion.
Mr. Ersoff then assisted the mother in writing a protective order to keep the father from having his upcoming visitation with C.H. after he advised her that she had two choices: either she had to get a protective order or the state could obtain an instanter order and take C.H. into state custody. Athough represented by counsel in the pending divorce proceeding, the *604 mother apparently filed a pro se petition for a protective order the following day, May 14, 2008.
On the other hand, Det. Rei, who witnessed the interview, testified that the interview was a “poor interview.” He said that Mr. Ersoff reported to him that the medical examination showed no evidence of sexual abuse. He interviewed the father on May 15, 2008 regarding the allegations. Detective Rei said he was also subsequently informed by Mr. Ersoff of an email from the mother on May 21, a week after the Gingerbread House interview. The mother reported that C.H. disclosed to her that her father tickled her “front booty” with a “bumblebee” massager.[2] However, Det. Rei did not investigate this new allegation because, in his view, it was “tainted” because the mother had shown the child pictures of the massager. He discussed the case with his supervisor and they decided to close the case and it would not be referred to the D.A. for further action.
|flThe mother sent the email in question to Mr. Ersoff on May 21, 2008. In it she reported that while she was applying medicine to C.H.’s labia with a Q-tip, C.H. said that it tickled, and that “Daddy does it without medicine.” She wrote also that C.H. further said that sometimes it tickles and sometimes it hurts “When he does the bumblebee on my front booty.” She said she then recalled that she and the father had a bumblebee massager that vibrates. The mother then looked for pictures of a bumblebee massager online, and after finding it, showed it to C.H., who identified the bumblebee and pointed to her vagina and said, “It hurts. Don’t tell Daddy it hurts.” The mother also stated in concluding the email to Mr. Ersoff that she was not sure if she had mentioned to him that the father was addicted to pornography.
Prior to the email, the juvenile court issued a restraining order on May 14, 2008, noting on the order that it had conferred with the First Judicial District Court presiding judge, and the juvenile court was “assuming exclusive jurisdiction of this case of alleged sexual abuse of the child pending hearing and adjudication.” The order also provided that the father would not be allowed visitation with the children pending further orders. A hearing was scheduled for May 28, 2008.
In response to the mother’s motion, on May 21, 2008, the father filed a motion to transfer the matter to district court pursuant to La. Children’s Code art. 1568(E), which provides that “if a suit for divorce is pending, any application for a protective order shall be filed in that proceeding.” The father also requested that the court order the Department of Social Services to allow him access to their investigative file so that he could defend against | (ithe petition for a protective order.
Rather than dismiss the motion or transfer the matter to the district court, the juvenile court, sua spoute, authorized the mother to file a CINC petition and granted her 10 days to amend her petition accordingly.[3] The court issued a modified *605 protective order maintaining the prior restraining order be in force until June 9, 2008.
Given court authorization, the mother filed a CINC petition on June 4, 2008, again alleging that the father had inappropriately touched their daughter. The matter was scheduled for a hearing on August 20, 2008.
Between the time of the original petition filed by the mother and the first of several evidentiary hearings beginning on August 20, 2008, in addition to the investigations by Mr. Ersoff of the OCS and Det. Rei of the Shreveport Police Department, the court appointed a “CASA” (Court 17Appointed Special Advocate) representative from the Volunteers of Youth Justice. CASA supervisor Kelli Todd filed a report by letter to the juvenile court in advance of the evidentiary hearing. The report detailed CASA’s three interviews with C.H. in its investigation of the allegations. At the conclusion of the report, CASA recommended to the juvenile court that the previous custody judgment of the district court be immediately reinstated. Ms. Todd was concerned that the parents were in the middle of a custody dispute and that CASA “does not feel that C.H. has freely disclosed information to CASA and in fact C.H. told CASA that her mother told her to tell CASA about the bumblebee.”[4]
After the CASA recommendation, the father filed a reconventional demand alleging that the children were in need of care as victims of abuse by the mother, who was vindictively attempting to deprive the children of their natural relationship with their father by using C.H. as a tool to fabricate false allegations against him. However, the juvenile court denied the father authorization to initiate a CINC proceeding and treated his pleading as simply a “motion to dismiss” the mother’s petition.
At some point prior to the hearing, pursuant to Art. 607 of the Children’s Code, the court appointed an attorney for C.H. from the Mental Health Advocacy Service to represent the interest of C.H.
Trial was held on August 20, September 23, 25, and 30. The court issued oral reasons for judgment on October 15, 2008, finding that C.H. was a child in need of care, but expressly finding that S.H. was not a child in|sneed of care.
*606 Specifically, the court found that the mother was credible in reporting the child abuse despite the numerous “attacks” on her credibility. It also found that C.H. made a disclosure of sexual abuse at the Gingerbi*ead House interview although there were inconsistencies in her disclosure. It concluded that the “fundamental” disclosure was not prompted or the product of improper leading.
The court also found that the statements of the child were not “clear and convincing,” but found evidence to corroborate the mother’s and the child’s statements in the testimony of Dr. Rodriguez, who the court said found that the labial adhesion was “consistent” with the allegation of sexual molestation.
Pursuant to a judgment of disposition filed on November 19, 2008, C.H. was placed in the mother’s sole custody subject to the exclusive jurisdiction of the juvenile court. The father was allowed weekly supervised visitation with C.H. at his cost, plus counseling costs for the child, “sexual perpetrator” counseling for himself, and child support.
The father filed this appeal, assigning three errors to the juvenile trial court and contending that it manifestly erred or abused its discretion in three of its factual findings to support its adjudication of C.H. as a child in need of care.
The mother answered the appeal demanding that S.H. also be declared a child in need of care.
C.H.’s attorney also submitted a brief on behalf of C.H. that aligned herself with the mother’s position in this appeal.
|9Discussion
It is well settled that an appellate court cannot set aside a juvenile court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong. In re A.J.F., 2000-0948 (La.6/30/00), 764 So.2d 47; State ex rel. J.A., 43,998 (La.App. 2 Cir. 12/3/08), 999 So.2d 811. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. Id. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. Id.; see also Rosell v. ESCO, 549 So.2d 840 (La.1989). If the juvenile court’s findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. In re A.J.F., supra.
Reversal of findings of fact on appeal requires that (1) the appellate court find from the record that no reasonable factual basis exists for the trial court’s finding, and (2) the appellate court determine that the record establishes the finding is clearly wrong or manifestly emmeous. State ex rel. J.A., supra; Williams v. State ex rel. Dept. of Social Services, 37,-923 (La.App. 2 Cir. 1/28/04), 865 So.2d 908, writ denied, 2004-0514 (La.4/8/04), 870 So.2d 276. If there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Dept. of Transp. & Dev., 617 So.2d 880|10(La.1993).
We are also mindful that this proceeding was commenced by the mother in the midst of an acrimonious custody dispute. “[W]here the claim of abuse arises in connection with other, highly-charged disputes (such as divorce or custody and visitation proceedings), the determination that *607 sexual abuse occurred is fraught with added dangers:
More and more allegations of incest and [child] sexual abuse by husbands are being made by their wives during custody disputes. If the allegations are proven, the perpetrator, usually the husband/father, is excluded from contact with his children.... Child psychiatrists are frequently used by both sides to evaluate the child and make a determination about the authenticity of the charges.... A mistake might jeopardize a child’s future or destroy a man’s family life and career. Green, “True and False Allegations of Sexual Abuse in Child Custody Disputes,” Journal of the American Academy of Child Psychiatry, vol. 25, 449-456, at p. 449 [1986], And, regardless of the setting where the claim arises, there is also the danger, where it is not the child himself or herself who specifically makes the abuse charge, that unfounded allegations of sexual abuse can have a permanent detrimental effect upon the child. Cf. Matter of Jessica G., 151 Misc.2d 694, 696, 573 N.Y.S.2d 251 [ (1991) ]. See Caryl S. v. Child & Adolescent Treatment Services, Inc,., 161 Misc.2d 563, 614 N.Y.S.2d 661 (N.Y.Sup. May 10, 1994).
As the United States Supreme Court has recognized, “experience has shown that the question of custody, so vital to a child’s happiness and well being, frequently cannot be left to the discretion of parents. This is particularly true where, as here, the estrangement of a husband and wife beclouds parental judgment with emotion and prejudice.” Ford v. Ford, 371 U.S. 187, 193, 83 S.Ct. 273, 277, 9 L.Ed.2d 240 (1962).
The sole issue presented is whether the petitioner established by a preponderance of the evidence that C.H. has been sexually abused by the | nfather and therefore was properly adjudicated a child in need of care. We have reviewed the entire record in this case, including the testimony at trial, the Gingerbread House interview, and the reports and letters contained in the record. Based on this complete review, for the following reasons, we conclude that the trial court was clearly wrong in concluding that there was a preponderance of evidence to support its finding that C.H. was a victim of sexual abuse by the father.
As stated above, the trial court concluded that (1) the mother’s allegations of sexual abuse were credible and not motivated by the custody dispute, (2) the Gingerbread House interview of C.H. confirmed the mother’s allegations and resulted in a credible disclosure of abuse, and (3) the sexual abuse was corroborated by Dr. Rodriguez’s examination. On appeal, the father contends that the trial court erred in each of these findings.

The Mother’s Credibility

We consider the father’s third assignment of error first because it relates to the trial court’s initial finding that the mother’s allegations were credible. The father contends that the trial court committed manifest error by failing to give any weight to the evidence submitted that showed that the mother had a motive to deprive the father of custody by advancing false accusations of sexual abuse through coaching the child.
The mother moved out of the matrimonial domicile on November 1, 2007. In mid-December, the father’s sister moved into the house with him and remained until the end of April. Thus, she was present during the weekends that the father had custody of C.H. The father had custody of 112C.H. only one more weekend after that, from May 1 to 5, and his mother was present during that weekend. Furthermore, the father’s mother was present dur *608 ing nearly all the weekends that the father had custody of the child, making it unlikely, he argues, that he would abuse the child.
The father testified that when the parties separated, he declared he wished to share custody of the children on a 50-50 basis, but the mother made it known, even before the separation, that should they ever separate she would get the children full-time. After the separation, the mother told him that he would not have the children. He testified that the mother called him and asked him not to pursue equal custody of the children, and that, unless he dropped the request, it was going to get ugly.
The father also recounted some of the dates and circumstances in which the mother told him she would not let him have equal custody and that she alone would determine visitation; however, the court disallowed more testimony on the matter, stating that it had no impact upon the child’s disclosure and on the physical findings by a doctor.
C.H.’s paternal grandmother also testified regarding a conversation with the mother after the separation in which the mother told her that she would “fix it where we (the paternal grandparents) would never see the children again.”
The father placed into evidence several photographic images made of the mother’s “My Space” page. These pages contained comments posted by the mother that disturbingly coincide with events in the CINC proceedings. The May 17, 2008 image of her My Space page states: “If you want something done right, you have to do it yourself.” While the mother | ^acknowledged the comment, she claimed no knowledge of what she was referring to, even though the comment was posted three days after she filed the Petition for Protection from Abuse in propria persona. On May 22, 2008, she posted: “He has all eternity to burn in hell. Let him suffer here a while longer.” Again the mother acknowledged the posting, but stated that she could not remember what or whom the posting referred to.
Finally, following the July 29, 2008 report from CASA which she acknowledged she reviewed, the mother wrote on her My Space page:
“S_ would feel much better if she could kick someone’s teeth out ... no one specific ... just wanna feel some teeth crack. Is that so wrong?”
In response to questioning about the page, the mother was again evasive. Finally, The mother posted on July 14, 2008:
“S_ always gets what she wants ... eventually.”
The trial court acknowledged that the My Space “diatribes” were “stupid,” but concluded that they were “understandable” if the allegations of sexual abuse are true. The court said, however, they had no effect on the child’s disclosure and the medical findings.
In its oral reasons for judgment, the court found the mother credible because “her demeanor was calm and controlled, matter-of-fact, not excitable, vengeful, or overly dramatic,” while discounting or explaining away the “attacks” on her credibility.
First, as we have indicated above, we find it questionable that the court authorized a private litigant involved in an ongoing child custody litigation to personally file a CINC petition against the opposing 114parent/litigant accusing him of child sexual abuse.[5] Be that as it may, under these *609 circumstances, when the petitioner’s personal interest in the outcome (obtaining sole custody or depriving the father of custody) might not coincide with the best interest of the child, which, after all, is the paramount goal of the CINC proceeding, a court should be extremely cautious in giving much weight to the accuser’s testimony no matter how cool, calm and collected he or she may appear on the witness stand.
The court also characterized the mother as having a cautious approach with Child Protective Services and stated that Er-soffs testimony made it clear that “Child Protective Services forced the issue of going to court, not [the mother].” Our review of the testimony of Ersoff indicates that the mother wanted to prevent the father from having visitation the upcoming weekend, and Ersoff told her that she had two choices: she could file a protective order herself so that the state could finish its investigation or the state could obtain an instanter order and take custody of the child. It would be easier for her to file the protective order and keep custody of the children. Ersoff then assisted her in filing a protective order. It appears, then, that Ersoff was not prepared to initiate a CINC proceeding because the investigation was not completed.
Regarding whether the mother might have been motivated to file the protective order because of the custody dispute, the trial court noted the May 2nd faxed suggestion that Shelly Booker be appointed for a custody evaluation, although “custody was going relatively well.” On the contrary, _jj¿even if we disregard the father’s testimony regarding threats by the mother during this time to make sure he never saw the children, the mother made the allegation of sexual abuse just four days after the May 2nd letter was sent, and in that letter, counsel for the mother wrote: “Mediation is not working!” This can hardly be construed to mean that the dispute over custody was going relatively well.
The trial court went into lengthy explanations to defend its finding that the mother’s allegations were credible in the face of substantial evidence to the contrary. For example, the mother’s report of C.H.’s alleged disclosure of the bumblebee massager, which the trial court referred to as a sexual weapon and a vibrator, conveniently came to the surface only a few days after the very inconclusive Gingerbread House interview. The bumblebee allegation was found to be not credible even by Mr. Er-soff of the OCS and Det. Rei. The CASA report and Ms. Todd’s testimony regarding CASA’s second and third interview clearly revealed that the mother had coached C.H. regarding the bumblebee massager and what to say at the interview. Given the fact that the bumblebee allegation was manifestly untrustworthy by all counts, one must ask whether the mother’s initial allegation of “tickling” is credible. The court, however, in its reasons for judgment, rejected Ms. Todd’s testimony and the CASA report, ostensibly because Ms. Todd was not credible because she wrote in the report that the mother planned to move to Arkansas, which the mother vehemently denied, despite evidence to the contrary.
These matters, which include the fact that the allegations were made only after mediation of the custody dispute broke down, the CASA findings | lfitaken with and in consideration of the undisputed evidence on My Space and the mother’s desire to keep the father from having equal custody of the children, lead us to the conclusion that the trial court clearly erred in giving little or no weight to the evidence that raises serious questions about the mother’s *610 motivation in making these allegations. Although credibility determinations are the exclusive province of the trier of fact, we find it inconceivable that the court largely ignored or discounted the evidence discussed above. We conclude that the mother’s allegations have little weight in determining whether or not the sexual abuse occurred in this instance. In general, when allegations like these do not arise until after a custody dispute has arisen, the court and appropriate agencies should cautiously investigate the allegations to make an independent determination whether there has been sexual abuse.

The Gingerbread House Interview

By his first assignment of error, the father contends that the trial court erred in finding that the child made a credible disclosure of child abuse during the Gingerbread House interview.
We have closely reviewed the videotape of the Gingerbread House interview and conclude that the disclosure of sexual abuse made by C.H. is, at best, equivocal. The interview took place at a small table in a room. It began with the interviewer, Crystal Clark, giving the child her name and asking C.H. her name. C.H. knew her name and her parents’ and brother’s first names. C.H. did not know her own age (age four). After Ms. Clark told C.H. that she was four years old, Ms. Clark asked C.H. how old was her brother (S.H.). C.H. responded that he was four, when in fact, S.H. wasJjjtwo.
Ms. Clark placed a white page on the table that contained two side-by-side drawings of a young female depicting the front and back side of the body. Ms. Clark then pointed a pen or marker at each part of the body while asking the child to identify the body part. C.H. was able to identify most of the body parts except the chest, namely, the eyes, lips, navel, fingers, genital area, feet and legs on the front part of the body. She referred to the front genital area as the “booty.” She did largely the same on the back side of the drawing, identifying the buttocks also as the “booty.”
When asked if she took baths at her daddy’s house, C.H. said that her daddy and her mommy give her baths. She later stated that when she is at her father’s house, “Nana” gives her baths.
When asked twice if anyone touched her booty, she said “no” to each question. Ms. Clark asked her if anyone did anything to her that scared her, she said “no-yes.” When asked how, C.H. said that [S.H., i.e., her little brother] pushed her against the wall. To the same questions again, she said Nana had a horse and related an unintelligible response regarding it.
At this point, Ms. Clark appeared to have completed her questioning, and asked Mr. Ersoff and Det. Rei, who were observing the interview and had the ability to communicate via private intercom with Ms. Clark, if they had any questions they wanted her to ask. Ms. Clark then asked the child if she ever gets tickled. C.H. said that her daddy tickles her. When asked to show on the drawing where he tickles her, the child first appeared to point to the feet on the drawing and then she said “all over.” When asked if her daddy tidded her on top of her clothes or under them, C.H. said “on top of |1Hher clothes” and again said he tickles her on her back. When asked if her father kissed her, the child said yes, and when asked where, she said on her face and when asked if he kissed her anywhere else, she pointed to her forehead.
Ms. Clark asked the child if she had been told to keep a secret. She said yes, “Nana has a kitty” and something about “Paw Paw.”
*611 Ms. Clark asked C.H. if she remembered that she earlier asked if daddy ever touched her booty. C.H. did not remember. Ms. Clark then asked her again if daddy touched her booty when he tickled her. She said no, then yes, that daddy and mommy, then she said, “no, not mommy.”
Ms. Clark asked C.H. what does he tickle/touch her with and the child said his fingers. When asked if he tickled her on top of her clothes or underneath, she first said on top. Asked again, she said underneath her clothes. It was unclear if she said underneath when she was asked about under her underwear. At the close of the interview, however, Ms. Clark asked her again, pointing on the drawing to the genital area, does he tickle you on top of your clothes or underneath. C.H. answered “on top” of her clothes.
It is also noteworthy that when asked from what part of her body she “tee-teed,” the child pointed to her buttocks on the drawing, even when Ms. Clark questioned her about that answer while pointing to the front genital area. C.H. said she was not afraid when her father tickled her and she liked being tickled.
The father contends on appeal that an objective viewing of the Gingerbread House interview reveals a very immature child and no | ^evidence of abuse. He points out that in her petition, the mother specifically attributes the child’s use of the word “pee-pee” to the child in referring to her vaginal area, but in the Gingerbread House interview, the child uses only the word “booty.” The father also contends that in the CASA interview regarding the bumblebee massager allegation, she uses the phrase “front booty.”
Ersoff reported that the mother emailed him after the Gingerbread House interview and after the interview with the father, relating a new allegation that the child had disclosed to her that her father touched her vaginal area with a “bumblebee” massager.
Mr. Ersoff reported this to Det. Rei; however, Det. Rei declined to further interview the child after learning that the mother had tainted any evidentiary value of interviewing the child by reviewing the matter of the massager and showing her pictures of the massager even after Ersoff told her not to discuss allegations with the child. Detective Rei further stated that in the Gingerbread House interview, the child made inconsistent statements, did not know her colors, and even her own age. It was a “poor interview.”
Even Mr. Ersoff did not attach credibility to the massager story. He agreed that the child did not use the term “pee-pee” in referring to her vaginal area, and he admitted that the child denied that her father kissed her there as reported by the mother.
Finally, according to the CASA report in the record, the two CASA representatives rejected the allegations after their investigation, concluding that the child had been coached by the mother and that the allegations were |.^raised only after heated disagreement in the custody dispute in the divorce proceeding in which the father wanted to see the children every other weekend. The mother rejected this visitation plan, wanting to move back to Arkansas with the children.
Kelli Todd of CASA was appointed on June 17, 2008 to investigate the allegations and report to the court. She had three separate visits with the children. She asked the mother to bring some family photographs to form a context for the interview. When she put the CD in her computer, the first four photographs were of the “bumblebee” massager and C.H. (spontaneously) advised her that she and her mother had looked at them the night *612 before. Based upon how C.H. acted and answered questions during the interviews, Ms. Todd believed that C.H. had been coached by the mother. Ms. Todd was also concerned that both the father and the paternal grandparents had been denied visitation for the past three months. The children were in Arkansas living with the mother’s parents who would not allow the paternal grandparents to see their grandchildren.
Michelle Edwards, the other CASA representative, concurred in the conclusion that the child had been coached. Ms. Todd was also present on one of the visits and participated in questioning the child. The child told Ms. Edwards that her mother was present when her daddy tickled her on the knee with the massager.
We conclude that the trial court manifestly erred in concluding that C.H. made a credible disclosure of sexual abuse at the Gingerbread House interview. The child appeared to be somewhat immature. On the questions regarding her daddy touching and tickling her “booty,” she answered “no” |2]more often than “yes,” and except for saying he tickled her in the genital area, most of the mother’s account of the disclosure to her was not corroborated by C.H. As we previously stated, the interview yielded equivocal results and thus would need very strong corroboration for a factfinder to conclude that sexual abuse had occurred.
The trial court looked for and found this corroboration in the testimony of Dr. Jennifer Rodriguez. The father argues that Dr. Rodriguez’s testimony clearly does not corroborate any sexual abuse. We agree.
Dr. Rodriguez testified that she examined the child three times: May 13, May 28 and June 11, 2008. She stated that before the first examination she was told that there was suspected child abuse. The mother also made allegations of abuse to her. The child never said anything about any abuse.
Dr. Rodriguez discovered on May 13 that the child had a labial adhesion, a condition such that a portion of the small vaginal lips are sealed, so that the doctor could not see her hymen well at that time. She said some children have labial adhe-sions and can be born with them, or will get them in the healing process of an irritation or trauma to that area. Dr. Rodriguez prescribed a cream for the adhesion. In the two subsequent visits, she found the adhesion was healing due to the cream, and she said that the hymen was intact.
Dr. Rodriguez testified that normal children can have labial adhesions with no known history of abuse adding, “Anything that could cause some redness and irritation in the private area could cause the skin to need to seal up and heal.”
^Although Dr. Rodriguez testified that the irritation was consistent with sexual abuse, she said it was not diagnostic of abuse. She said the irritation can be caused by any number of things, including soap, riding a bicycle, a rash, or any other irritation in that area. Importantly, Dr. Rodriguez said that the labial adhesion neither confirms nor denies the possibility of sexual abuse.
As an alternative explanation of a possible cause of the irritation, the father’s mother testified that on May 3, which is only 11 days before the examination and the child abuse allegation, she and her husband took the child to a company picnic in which the child participated in a rock wall climbing activity. They placed in evidence a photograph taken that day of C.H. participating in the activity, which shows a harness strapped between the child’s legs. The father contends that this was the likely source of the irritation.
We conclude that Dr. Rodriguez’s testimony does not corroborate the perceived *613 disclosure from the Gingerbread House interview and the trial court was clearly wrong in so concluding.
Conclusion
Based on our review of the record in this case, we conclude that the trial court was clearly wrong in finding that a preponderance of the evidence showed that C.H. had been abused by her father. Because we have reached this result, the mother’s answer to the appeal is moot.
Accordingly, we reverse the judgment of the juvenile trial court finding C.H. a child in need of care. We vacate the juvenile court’s Judgment of Disposition and the Protective Order in this case. We remand |zJo the juvenile trial court with instructions to dismiss the CINC petition and transfer this matter back to the First Judicial District Court. The mother is cast for all costs of this appeal.
REVERSED; JUDGMENT VACATED; REMANDED WITH INSTRUCTIONS.
APPLICATION FOR REHEARING
Before BROWN, PEATROSS, DREW, MOORE and LOLLEY, JJ.
| iRehearing denied.

. Although the mother testified that she was fine with the interim custody arrangement, which was essentially a standard 50-50 custody plan, there is considerable evidence in the *603 record that she would not agree to sharing custody equally.

. The device is clearly a back massager and not a device designed for sexual stimulation. Rather, the "bumblebee” back massager looks much like a toy ladybug with a happy face. There are four legs extending downward from the plastic oval body with small plastic balls for feet, and the device vibrates when activated.

. The court clearly should have transferred the matter to district court as required by Art. 1568(E), which is why Section C of the same article requires the petitioner to inform the court whether a suit for divorce is pending.
On the other hand, La. Ch.Code art. 631 states:
A. A child in need of care proceeding shall be commenced by petition filed by the dis *605 trict attorney. Any other person authorized by the court may file a petition if there are reasonable grounds to believe that the child is in need of care. (Emphasis supplied).
Although the phrase in the statute, “any other person authorized by the court,” might be construed to mean any person, whether associated with the stale or not, we are somewhat skeptical of a construction that gives the juvenile court authority to authorize a parent or any other third party to initiate the proceeding, particularly when there has been no hearing to determine whether "there are reasonable grounds to believe the child is in need of care.” The scant jurisprudence on this issue at least implies that “any other person” means only that an employee of the local child protection unit (or perhaps a peace officer) can file a complaint for removal of a child via an instanter order and commence a child in need of care proceeding by filing a petition. See State ex rel. J.F., 2007-1496 (La.App. 3 Cir. 5/14/08), 2008 WL 2042813 (not reported in Southern Reporter). It is always the stale, however, who is proceeding on behalf of the child in "child in need of care” proceedings, as recognized by the mother’s counsel on appeal who characterizes the mother's action as "acting in the state’s stead.” Thus, "the state shall have the burden to prove the allegations of the petition by a preponderance of the evidence.” La. Ch. C. art. 665.

. The court stated that it was not going to accept the report into evidence because Ms. Todd of CASA was available to testify and because Ms. Todd made conclusions about the veracity of the parents.

. We observe that this same court previously attempted to expand its jurisdiction in Martin *609 ex rel. K.M. v. Harrison, 37,891 (La.App. 2 Cir. 9/26/03), 855 So.2d 950.